**Fill in this information to identify the case:**

United States Bankruptcy Court for the:

_____ District of _____

Case number (*If known*): _____ Chapter _____

'23 AUG 23 PM4:20
FILED/ USBC-EDTN KNX

❑ Check if this is an
amended filing

Official Form 105

# Involuntary Petition Against an Individual                    12/15

Use this form to begin a bankruptcy case against an individual you allege to be a debtor subject to an involuntary case. If you want to begin a case against a non-individual, use the *Involuntary Petition Against a Non-individual* (Official Form 205). Be as complete and accurate as possible. If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write name and case number (if known).

| Part 1: | Identify the Chapter of the Bankruptcy Code Under Which Petition Is Filed |
|---|---|

1. **Chapter of the Bankruptcy Code**

   *Check one:*

   ☒ Chapter 7

   ❑ Chapter 11

| Part 2: | Identify the Debtor |
|---|---|

2. **Debtor's full name**

   Maxwell
   First name

   David
   Middle name

   Woolums
   Last name

   _____
   Suffix (Sr., Jr., II, III)

3. **Other names you know the debtor has used in the last 8 years**

   Include any assumed, married, maiden, or trade names, or *doing business as* names.

   David Maxwell Woolums

   Dave Woolums

4. **Only the last 4 digits of debtor's Social Security Number or federal Individual Taxpayer Identification Number (ITIN)**

   ❑ Unknown

   xxx – xx – 9 5 9 1      OR      9 xx – xx – ___ ___ ___ ___

5. **Any Employer Identification Numbers (EINs) used in the last 8 years**

   ☒ Unknown

   ___ ___ – ___ ___ ___ ___ ___ ___ ___
   EIN

   ___ ___ – ___ ___ ___ ___ ___ ___ ___
   EIN

Debtor _____     Case number (if known)_____

| | **Principal residence** | **Mailing address, if different from residence** |
|---|---|---|
| **6.  Debtor's address** | | |

875 Old Towne Loop
<u>Number     Street</u>                          Number     Street

_____     _____

Seymour  TN  37865
<u>City            State   ZIP Code</u>     City                 State   ZIP Code

Sevier
<u>County</u>

**Principal place of business**

124 N Henderson Ave
<u>Number     Street</u>

_____

Sevierville TN  37862
<u>City          State   ZIP Code</u>

Sevier
<u>County</u>

---

**7.  Type of business**

☐ Debtor does not operate a business

*Check one if the debtor operates a business:*

☐ Health Care Business (as defined in 11 U.S.C. § 101(27A))

☒ Single Asset Real Estate (as defined in 11 U.S.C. § 101(51B))

☐ Stockbroker (as defined in 11 U.S.C. § 101(53A))

☐ Commodity Broker (as defined in 11 U.S.C. § 101(6))

☐ None of the above

---

**8.  Type of debt**

**Each petitioner believes:**

☒ **Debts are primarily consumer debts.** *Consumer debts* are defined in 11 U.S.C. § 101(8) as "incurred by an individual primarily for a personal, family, or household purpose."

☒ **Debts are primarily business debts.** *Business debts* are debts that were incurred to obtain money for a business or investment or through the operation of the business or investment.

---

**9.  Do you know of any bankruptcy cases pending by or against any partner, spouse, or affiliate of this debtor?**

☒ No

☐ Yes. Debtor _____     Relationship _____

District _____ Date filed _____     Case number, if known _____
                                    MM / DD / YYYY

Debtor _____     Relationship _____

District _____ Date filed _____     Case number, if known _____
                                    MM / DD / YYYY

---

Debtor _____     Case number *(if known)*_____

| **Part 3:** | **Report About the Case** |

**10. Venue**

Reason for filing in this court.

*Check one:*

☑ Over the last 180 days before the filing of this bankruptcy, the debtor has resided, had the principal place of business, or had principal assets in this district longer than in any other district.

☐ A bankruptcy case concerning debtor's affiliates, general partner, or partnership is pending in this district.

☐ Other reason. Explain. (See 28 U.S.C. § 1408.) _____

**11. Allegations**

Each petitioner is eligible to file this petition under 11 U.S.C. § 303(b).

The debtor may be the subject of an involuntary case under 11 U.S.C. § 303(a).

*At least one box must be checked:*

☑ The debtor is generally not paying such debtor's debts as they become due, unless they are the subject of a bona fide dispute as to liability or amount.

☐ Within 120 days before the filing of this petition, a custodian, other than a trustee, receiver, or agent appointed or authorized to take charge of less than substantially all of the property of the debtor for the purpose of enforcing a lien against such property, was appointed or took possession.

**12. Has there been a transfer of any claim against the debtor by or to any petitioner?**

☑ No

☐ Yes. Attach all documents that evidence the transfer and any statements required under Bankruptcy Rule 1003(a).

**13. Each petitioner's claim**

| Name of petitioner | Nature of petitioner's claim | Amount of the claim above the value of any lien |
|---|---|---|
| Park Enterprises LP | fiduciary fraud tax evasion attempt | minimum $ 10k |
| Indian Gap Investments LP | tax evasion attempt, Conversion, fiduciary breach co-trustee | minimum $ 10K |
| KLW Management LLC | embezzlement | minimum $ 45k |
| Whaley Realty CRL LLC | malicious injury, fiduciary breach fees, tax evasion attempt not paying debt, but able | minimum $ 66,000 |

Total $ 66,000

If more than 3 petitioners, attach additional sheets with the statement under penalty of perjury, each petitioner's (or representative's) signature under the statement, along with the signature of the petitioner's attorney, and the information on the petitioning creditor, the petitioner's claim, the petitioner's representative, and the attorney following the format on this form.

Debtor _____    Case number *(if known)*_____

---

| Part 4: | Request for Relief |
|---|---|

Petitioners request that an order for relief be entered against the debtor under the chapter specified in Part 1 of this petition. If a petitioning creditor is a corporation, attach the corporate ownership statement required by Bankruptcy Rule 1010(b). If any petitioner is a foreign representative appointed in a foreign proceeding, a certified copy of the order of the court granting recognition is attached.

Petitioners declare under penalty of perjury that the information provided in this petition is true and correct.  Petitioners understand that if they make a false statement, they could be fined up to $250,000 or imprisoned for up to 5 years, or both.
18 U.S.C. §§ 152 and 3571. If relief is not ordered, the court may award attorneys' fees, costs, damages, and punitive damages. 11 U.S.C. § 303(i).

**Petitioners or Petitioners' Representative**                    **Attorneys**

✗ _~Krystal Whaley (signature)~_                    ✗ _____
Signature of petitioner or representative, including representative's title          Signature of attorney

_Krystal Lee Whaley_
Printed name of petitioner                              _____
                                                        Printed name

Date signed  08 / 23 / 2023
            MM / DD / YYYY                              _____
                                                        Firm name, if any

                                                        _____
                                                        Number    Street

**Mailing address of petitioner**
                                                        _____
711 Dolly Parton Pkwy # 4628                            City              State        ZIP Code
Number    Street
                                                        Date signed _____
Sevierville   TN   37862                                            MM / DD / YYYY
City          State    ZIP Code
                                                        Contact phone _____  Email _____

**If petitioner is an individual and is not represented by an attorney:**

Contact phone  949 220 3155
Email  overnightrentals8665@gmail.com

**Name and mailing address of petitioner's representative, if any**

_____
Name

_____
Number    Street

_____
City          State        ZIP Code

**PREPARED BY:**
**Philip Nemeth, Attorney at Law**
**Post Office Box 270**
**Gatlinburg, TN 37738**

# AFFIDAVIT AND STATEMENT
# OF PARTNERSHIP AUTHORITY

RE:   **INDIAN GAP INVESTMENTS, LP**

**KRYSTAL L. WHALEY**, Manager of **KLW MANAGEMENT, LLC**, the sole General Partner of **INDIAN GAP INVESTMENTS, LP**, files this Affidavit and Statement of Partnership Authority pursuant to T.C.A. §61-1-303 and §61-2-1205 and states on oath as follows:

1.     **NAME OF LIMITED PARTNERSHIP**:  The name of the limited partnership is INDIAN GAP INVESTMENTS, LP and a copy of the Certificate of Limited Partnership, as filed with the Secretary of State of South Dakota is attached hereto as **Exhibit "A"**.

2.     **IDENTITY OF GENERAL PARTNER**:  The sole General Partner of INDIAN GAP INVESTMENTS, LP is KLW MANAGEMENT, LLC, a South Dakota Limited Liability Company, and I am the Manager of KLW MANAGEMENT, LLC.

3.     **PARTNER AUTHORIZED TO EXECUTE INSTRUMENTS TRANSFERRING REAL PROPERTY**:  The sole General Partner, KLW MANAGEMANT, LLC is the only partner authorized to execute any instrument transferring real property held in the name of INDIAN GAP INVESTMENTS, LP.

4.     **RELIANCE**:  Every bank or other financial institution, insurance company, transfer agent, issuer, obligor, safe deposit box company, title insurance company, or other person, firm or corporation to which this Affidavit and Statement of Partnership Authority, or photocopy hereof, is presented is authorized to receive, honor, and give effect to any and all instruments signed pursuant to the foregoing Affidavit and Statement of Authority without inquiring as to the circumstances of their issuance or the disposition of the property delivered pursuant thereto.

Executed by KRYSTAL L. WHALEY, as Manager of KLW MANAGEMENT, LLC, the sole General Partner of  INDIAN GAP INVESTMENTS, LP this 25th day of February, 2019.

INDIAN GAP INVESTMENTS, LP

By:  KLW MANAGEMENT, LLC,
General Partner

By:  _____
KRYSTAL L. WHALEY, Manager

PHILIP NEMETH, ATTORNEY AT LAW, 4515 EAST PARKWAY, P. O. BOX 270, GATLINBURG, TN 37738 (865) 436-7666

**STATE OF TENNESSEE**
**COUNTY OF SEVIER**

Before me, the undersigned authority, a Notary Public of the state and county aforesaid, personally appeared **KRYSTAL L. WHALEY**, with whom I am personally acquainted (or proved to me on the basis of satisfactory evidence), and who, upon being duly sworn and cautioned, stated on oath that the statements contained in the foregoing Affidavit and Statement of Partnership Authority are true and correct and who further acknowledged himself to be the Manager of KLW MANAGEMENT, LLC, a South Dakota Limited Liability Company, the sole General Partner of INDIAN GAP INVESTMENTS, LP and that she as such Manager, being authorized so to do, executed the foregoing instrument for the purpose therein contained by signing the name of KLW MANAGEMENT, LLC as General Partner of INDIAN GAP INVESTMENTS, LP.

WITNESS my hand and Official Seal in said State and County this the 25th day of February, 2019.

Notary Public

My Commission Expires:  October 20, 2020

**PREPARED BY:**
**Philip Nemeth, Attorney at Law**
**Post Office Box 270**
**Gatlinburg, TN 37738**

# AFFIDAVIT AND STATEMENT
# OF PARTNERSHIP AUTHORITY

RE:    **PARK ENTERPRISES, LP**

    **KRYSTAL L. WHALEY**,  Manager of **KLW MANAGEMENT, LLC**, the sole General Partner of **PARK ENTERPRISES, LP**, files this Affidavit and Statement of Partnership Authority pursuant to T.C.A. §61-1-303 and §61-2-1205 and states on oath as follows:

    1.    **NAME OF LIMITED PARTNERSHIP**:  The name of the limited partnership is PARK ENTERPRISES, LP and a copy of the Certificate of Limited Partnership, as filed with the Secretary of State of South Dakota is attached hereto as **Exhibit "A"**.

    2.    **IDENTITY OF GENERAL PARTNER**:  The sole General Partner of PARK ENTERPRISES, LP is KLW MANAGEMENT, LLC, a South Dakota Limited Liability Company, and I am the Manager of KLW MANAGEMENT, LLC.

    3.    **PARTNER AUTHORIZED TO EXECUTE INSTRUMENTS TRANSFERRING REAL PROPERTY**:  The sole General Partner, KLW MANAGEMANT, LLC is the only partner authorized to execute any instrument transferring real property held in the name of PARK ENTERPRISES, LP.

    4.    **RELIANCE**:  Every bank or other financial institution, insurance company, transfer agent, issuer, obligor, safe deposit box company, title insurance company, or other person, firm or corporation to which this Affidavit and Statement of Partnership Authority, or photocopy hereof, is presented is authorized to receive, honor, and give effect to any and all instruments signed pursuant to the foregoing Affidavit and Statement of Authority without inquiring as to the circumstances of their issuance or the disposition of the property delivered pursuant thereto.

    Executed by KRYSTAL L. WHALEY, as Manager of KLW MANAGEMENT, LLC, the sole General Partner of  PARK ENTERPRISES, LP this 25th day of February, 2019.

PARK ENTERPRISES, LP

By:  KLW MANAGEMENT, LLC,
    General Partner

By: _____
    KRYSTAL L. WHALEY, Manager

**STATE OF TENNESSEE**
**COUNTY OF SEVIER**

     Before me, the undersigned authority, a Notary Public of the state and county aforesaid, personally appeared **KRYSTAL L. WHALEY**, with whom I am personally acquainted (or proved to me on the basis of satisfactory evidence), and who, upon being duly sworn and cautioned, stated on oath that the statements contained in the foregoing Affidavit and Statement of Partnership Authority are true and correct and who further acknowledged himself to be the Manager of KLW MANAGEMENT, LLC, a South Dakota Limited Liability Company, the sole General Partner of PARK ENTERPRISES, LP and that she as such Manager, being authorized so to do, executed the foregoing instrument for the purpose therein contained by signing the name of KLW MANAGEMENT, LLC as General Partner of PARK ENTERPRISES, LP.

     WITNESS my hand and Official Seal in said State and County this the 25th day of February, 2019.

Notary Public

My Commission Expires:  October 20, 2020



**Tre Hargett**
Secretary of State

**Division of Business Services**
**Department of State**
State of Tennessee
312 Rosa L. Parks AVE, 6th FL
Nashville, TN 37243-1102

# Filing Information

Name:   **WHALEY REALTY CRL LLC**

## General Information

| | | | |
|---|---|---|---|
| **SOS Control #** | **000765589** | Formation Locale: | TENNESSEE |
| Filing Type: | Limited Liability Company - Domestic | Date Formed: | 07/23/2014 |
| | 07/23/2014 11:13 AM | Fiscal Year Close | 12 |
| Status: | Active | Member Count: | 1 |
| Duration Term: | Perpetual | | |
| Managed By: | Member Managed | | |

**Registered Agent Address**
WHALEY REALTY CRL LLC
KLW MANAGEMENT LLC
504 E MAIN STREET # 201 B
SEVIERVILLE, TN 37862

**Principal Address**
504 W MAIN STREET # 201 B
SEVIERVILLE, TN 37862

The following document(s) was/were filed in this office on the date(s) indicated below:

| Date Filed | Filing Description | Image # |
|---|---|---|
| 06/20/2023 | 2022 Annual Report | B1415-6727 |

Principal Address 1 Changed  From: 249 W BROADWAY  To: 504 W MAIN STREET # 201 B

Principal City Changed  From: NEWPORT  To: SEVIERVILLE

Principal Postal Code Changed  From: 37821-2829  To: 37862

Principal County Changed  From: COCKE COUNTY  To: SEVIER COUNTY

Registered Agent Physical Address 1 Changed  From: 249 W BROADWAY  To: 504 E MAIN STREET # 201 B

Registered Agent Physical Address 3 Changed  From: No Value  To: KLW MANAGEMENT LLC

Registered Agent Physical City Changed  From: NEWPORT  To: SEVIERVILLE

Registered Agent Physical County Changed  From: COCKE COUNTY  To: SEVIER COUNTY

Registered Agent Physical Postal Code Changed  From: 37821-2829  To: 37862

| 06/02/2023 | Notice of Determination | B1402-6863 |
| 06/21/2022 | 2021 Annual Report | B1237-5690 |

Principal Address 1 Changed  From: 400 PARK RD  To: 249 W BROADWAY

Principal City Changed  From: SEVIERVILLE  To: NEWPORT

Principal Postal Code Changed  From: 37862-8806  To: 37821-2829

Principal County Changed  From: SEVIER COUNTY  To: COCKE COUNTY

Registered Agent Physical Address 1 Changed  From: 400 PARK RD  To: 249 W BROADWAY

MAR 1 6 2022

Operating Agreement
WHAEY REALTY CRL LLC, a Tennessee Limited Liability Company

    THIS OPERATING AGREEMENT of WHALEY REALTY CRL LLC (the "Company") is entered into as of the date set forth on the signature page of this Agreement by each of the Members listed on Exhibit A of this Agreement.

A. The Members have formed the Company as a Tennessee limited liability company under the Tennessee Revised Limited Liability Company Act. The purpose of the Company is to conduct any lawful business for which limited liability companies may be organized under the laws of the state of Tennessee. The Members hereby adopt and approve the articles of organization of the Company filed with the Tennessee Secretary of State.

B. The Members enter into this Agreement to provide for the governance of the Company and the conduct of its business, and to specify their relative rights and obligations.

## ARTICLE 1: DEFINITIONS

Capitalized terms used in this Agreement have the meanings specified in this Article 1 or elsewhere in this Agreement and if not so specified, have the meanings set forth in the Tennessee Revised Limited Liability Company Act.

"Agreement" means this Operating Agreement of the Company, as may be amended from time to time.

"Capital Account" means, with respect to any Member, an account consisting of such Member's Capital Contribution, (1) increased by such Member's allocated share of income and gain, (2) decreased by such Member's share of losses and deductions, (3) decreased by any distributions made by the Company to such Member, and (4) otherwise adjusted as required in accordance with applicable tax laws.

"Capital Contribution" means, with respect to any Member, the total value of (1) cash and the fair market value of property other than cash and (2) services that are contributed and/or agreed to be contributed to the Company by such Member, as listed on Exhibit A, as may be updated from time to time according to the terms of this Agreement.

"Exhibit" means a document attached to this Agreement labeled as "Exhibit A," "Exhibit B," and so forth, as such document may be amended, updated, or replaced from time to time according to the terms of this Agreement.

"Member" means each Person who acquires Membership Interest pursuant to this Agreement. The Members are listed on Exhibit A, as may be updated from time to time according to the terms of this Agreement. Each Member has the rights and obligations specified in this Agreement.

"Membership Interest" means the entire ownership interest of a Member in the Company at any particular time, including the right to any and all benefits to which a Member may be entitled as provided in this Agreement and under the Tennessee Revised Limited Liability Company Act, together with the obligations of the Member to comply with all of the terms and provisions of this Agreement.

"Ownership Interest" means the Percentage Interest or Units, as applicable, based on the manner in which relative ownership of the Company is divided.

"Percentage Interest" means the percentage of ownership in the Company that, with respect to each Member, entitles the Member to a Membership Interest and is expressed as either:

A. If ownership in the Company is expressed in terms of percentage, the percentage set forth opposite the name of each Member on Exhibit A, as may be adjusted from time to time pursuant to this Agreement; or

B. If ownership in the Company is expressed in Units, the ratio, expressed as a percentage, of:

(1) the number of Units owned by the Member (expressed as "MU" in the equation below) divided by

(2) the total number of Units owned by all of the Members of the Company (expressed as "TU" in the equation below). Percentage Interest = TU

"Person" means an individual (natural person), partnership, limited partnership, trust, estate, association, corporation, limited liability company, or other entity, whether domestic or foreign.

"Units" mean, if ownership in the Company is expressed in Units, units of ownership in the Company, that, with respect to each Member, entitles the Member to a Membership Interest which, if applicable, is expressed as the number of Units set forth opposite the name of each Member on Exhibit A, as may be adjusted from time to time pursuant to this Agreement.

## ARTICLE 2: CAPITAL CONTRIBUTIONS, ADDITIONAL MEMBERS, CAPITAL ACCOUNTS AND LIMITED LIABILITY

2.1 Initial Capital Contributions. The names of all Members and each of their respective addresses, initial Capital Contributions, and Ownership Interests must be set forth on Exhibit A. Each Member has made or agrees to make the initial Capital Contribution set forth next to such Member's name on Exhibit A to become a Member of the Company.

2.2 Subsequent Capital Contributions. Members are not obligated to make additional Capital Contributions unless unanimously agreed by all the Members. If subsequent Capital Contributions are unanimously agreed by all the Members in a consent in writing, the Members

Package ID: C0284D87893B934A3F3A08AA14DAFF59

MAR 1 6 2022

may make such additional Capital Contributions on a pro rata basis in accordance with each Member's respective Percentage Interest or as otherwise unanimously agreed by the Members.

2.3 Additional Members. A. With the exception of a transfer of interest (1) governed by Article 7 of this Agreement or (2) otherwise expressly authorized by this Agreement, additional Persons may become Members of the Company and be issued additional Ownership Interests only if approved by and on terms determined by a unanimous written agreement signed by all of the existing Members.

B. Before a Person may be admitted as a Member of the Company, that Person must sign and deliver to the Company the documents and instruments, in the form and containing the information required by the Company, that the Members deem necessary or desirable. Membership Interests of new Members will be allocated according to the terms of this Agreement.

2.4 Capital Accounts. Individual Capital Accounts must be maintained for each Member, unless (a) there is only one Member of the Company and (b) the Company is exempt according to applicable tax laws. Capital Accounts must be maintained in accordance with all applicable tax laws.

2.5 Interest. No interest will be paid by the Company or otherwise on Capital Contributions or on the balance of a Member's Capital Account.

2.6 Limited Liability; No Authority. A Member will not be bound by, or be personally liable for, the expenses, liabilities, debts, contracts, or obligations of the Company, except as otherwise provided in this Agreement or as required by the Tennessee Revised Limited Liability Company Act. Unless expressly provided in this Agreement, no Member, acting alone, has any authority to undertake or assume any obligation, debt, or responsibility, or otherwise act on behalf of, the Company or any other Member.

## ARTICLE 3: ALLOCATIONS AND DISTRIBUTIONS

3.1 Allocations. Unless otherwise agreed to by the unanimous consent of the Members any income, gain, loss, deduction, or credit of the Company will be allocated for accounting and tax purposes on a pro rata basis in proportion to the respective Percentage Interest held by each Member and in compliance with applicable tax laws. 3.2 Distributions. The Company will have the right to make distributions of cash and property to the Members on a pro rata basis in proportion to the respective Percentage Interest held by each Member. The timing and amount of distributions will be determined by the Members in accordance with the Tennessee Revised Limited Liability Company Act. 3.3 Limitations on Distributions. The Company must not make a distribution to a Member if, after giving effect to the distribution: A. The Company would be unable to pay its debts as they become due in the usual course of business; or

B. The fair value of the Company's total assets would be less than the sum of its total liabilities plus the amount that would be needed, if the Company were to be dissolved at the time of the distribution, to satisfy the preferential rights upon dissolution of Members, if any, whose preferential rights are superior to those of the Members receiving the distribution.

## ARTICLE 4: MANAGEMENT

4.1 Management.

A. Generally. Subject to the terms of this Agreement and the Tennessee Revised Limited Liability Company Act, the business and affairs of the Company will be managed by the Members.

B. Approval and Action. Unless greater or other authorization is required pursuant to this Agreement or under the Tennessee Revised Limited Liability Company Act for the Company to engage in an activity or transaction, all activities or transactions must be approved by the Members, to constitute the act of the Company or serve to bind the Company. With such approval, the signature of any Members authorized to sign on behalf of the Company is sufficient to bind the Company with respect to the matter or matters so approved. Without such approval, no Members acting alone may bind the Company to any agreement with or obligation to any third party or represent or claim to have the ability to so bind the Company.

C. Certain Decisions Requiring Greater Authorization. Notwithstanding clause B above, the following matters require unanimous approval of the Members in a consent in writing to constitute an act of the Company:

(i)     A material change in the purposes or the nature of the Company's business;

(ii)    With the exception of a transfer of interest governed by Article 7 of this Agreement, the admission of a new Member or a change in any Member's Membership Interest, Ownership Interest, Percentage Interest, or Voting Interest in any manner other than in accordance with this Agreement;

(iii)   The merger of the Company with any other entity or the sale of all or substantially all of the Company's assets; and

(iv)    (iv) The amendment of this Agreement.

4.2 Officers. The Company must have individuals exercising the functions of the offices, however designated, of chief manager and secretary. The Members are authorized to appoint one or more officers from time to time. The officers will have the titles, the authority, exercise the powers, and perform the duties that the Members determine from time to time. Each officer will

MAR 1 6 2022

continue to perform and hold office until such time as (a) the officer's successor is chosen and appointed by the Members; or (b) the officer is dismissed or terminated by the Members, which termination will be subject to applicable law and, if an effective employment agreement exists between the officer and the Company, the employment agreement. Subject to applicable law and the employment agreement (if any), each officer will serve at the direction of Members, and may be terminated, at any time and for any reason, by the Members. In the absence of an appointed chief manager or secretary, the person or persons exercising the principal functions of the chief manager or the secretary are considered to have been elected to those offices.

## ARTICLE 5: ACCOUNTS AND ACCOUNTING

5.1 Accounts. The Company must maintain complete accounting records of the Company's business, including a full and accurate record of each Company transaction. The records must be kept at the Company's principal executive office and must be open to inspection and copying by Members during normal business hours upon reasonable notice by the Members wishing to inspect or copy the records or their authorized representatives, for purposes reasonably related to the Membership Interest of such Members. The costs of inspection and copying will be borne by the respective Member.

5.2 Records. The Members will keep or cause the Company to keep all records required by Section 406 of the Tennessee Revised Limited Liability Company Act, including the following business records.

　　(i) An up to date list of the Members and officers, if any, each of their respective full legal names, last known business or residence address, taxpayer identification number, Capital Contributions, the amount and terms of any agreed upon future Capital Contributions, and Ownership Interests, and Voting Interests;

　　(ii) A copy of the Company's federal, state, and local tax information and income tax returns and reports, if any, for the six most recent taxable years;

　　(iii) Copies of any financial statements for the three most recent years;

　　(v)　A copy of the articles of organization of the Company, as may be amended from time to time ("Articles of Organization");

　　(vi)　An original signed copy, which may include counterpart signatures, of this Agreement, and any amendments to this Agreement, signed by all then-current Members; and

　　(vii)　Financial information sufficient to provide true and full information regarding the status of the business and financial condition of the Company.

5.3 Income Tax Returns. Within 45 days after the end of each taxable year, the Company will use its best efforts to send each of the Members all information necessary for the Members to complete their federal and state tax information, returns, and reports and a copy of the Company's federal, state, and local tax information or income tax returns and reports for such year.

5.4 Subchapter S Election. The Company may, upon unanimous consent of the Members, elect to be treated for income tax purposes as an S Corporation. This designation may be changed as permitted under the Internal Revenue Code Section 1362(d) and applicable Regulations.

5.5 Tax Matters Member. Anytime the Company is required to designate or select a tax matters partner or partnership representative, pursuant to Section 6223 of the Internal Revenue Code and any regulations issued by the Internal Revenue Service, the Members must designate one of the Members as the tax matters partner or partnership representative of the Company and keep such designation in effect at all times.

5.6 Banking. All funds of the Company must be deposited in one or more bank accounts in the name of the Company with one or more recognized financial institutions. The Members are authorized to establish such accounts and complete, sign, and deliver any banking resolutions reasonably required by the respective financial institutions in order to establish an account.

## ARTICLE 6: MEMBERSHIP – VOTING AND MEETINGS

6.1 Members and Voting Rights. The Members have the right and power to vote on all matters with respect to which the Articles of Organization, this Agreement, or the Tennessee Revised Limited Liability Company Act requires or permits. Unless otherwise stated in this Agreement (for example, in Section 4.1(c)) or required under the Tennessee Revised Limited Liability Company Act, the vote of the Members holding at least a majority of the Voting Interest of the Company present and entitled to vote at a meeting in which a quorum is present is required to approve or carry out an action. The presence of Members holding a majority of the Voting Interests at a meeting of Members will constitute a quorum.

6.2 Meetings of Members. The Members must hold annual meetings of the Members to elect the Board of Managers and to conduct any other proper action. Interim meetings of the Members are not required but may be held at such time and place as the Members deem necessary or desirable for the reasonable management of the Company. In addition, a meeting may be called by the chief manager, the secretary, or any Member entitled to vote at the Meeting. A written notice setting forth the date, time, and location of a meeting must be sent at least ten (10) days but no more than sixty (60) days before the date of the meeting to each Member entitled to vote at the meeting. A Member may waive notice of a meeting by sending a signed waiver to the Company's principal executive office or as otherwise provided in the Tennessee Revised Limited Liability Company Act. In any instance in which the approval of the Members is required under this Agreement, such approval may be obtained in any manner permitted by the Tennessee Revised Limited Liability Company Act, including by conference call or similar communications equipment. Any action that could be taken at a meeting may be approved by a consent in writing

MAR 1 6 2022

that describes the action to be taken and is signed by Members holding the minimum Voting Interest required to approve the action. If any action is taken without a meeting and without unanimous written consent of the Members, notice of such action must be sent to each Member that did not consent to the action.

ARTICLE 7: WITHDRAWAL AND TRANSFERS OF MEMBERSHIP INTERESTS 7.1 Withdrawal. Members may withdraw from the Company prior to the dissolution and winding up of the Company (a) by transferring or assigning all of their respective Membership Interests pursuant to Section 7.2 below, or (b) if all of the Members unanimously agree in a written consent. Subject to the provisions of Article 3,

a Member that withdraws pursuant to this Section 7.1 will be entitled to a distribution from the Company in an amount equal to such Member's Capital Account.

7.2 Restrictions on Transfer; Admission of Transferee. A Member may not transfer any Membership Interests, whether now owned or later acquired, unless Members holding a majority of the Percentage Interests not subject to transfer consent to such transfer. A person may acquire Membership Interests directly from the Company upon the written consent of all Members. A Person that acquires Membership Interests in accordance with this Section 7.2 will be admitted as a Member of the Company only after the requirements of Section 2.3(b) are complied with in full.

ARTICLE 8: DISSOLUTION

8.1 Dissolution. The Company will be dissolved upon the first to occur of the following events:

(i)     The vote of the Members holding at least a majority of the Voting Interest of the Company to dissolve the Company;

(ii)     By action of a court pursuant to Sections 48-249-616 and 48-249-617 of the Tennessee Revised Limited Liability Company Act;

(iii)     By action of the Secretary of State pursuant to Section 48-249-605 (Administrative Dissolution) of the Tennessee Revised Limited Liability Company Act;

(iv)     At any time that there are no Members, unless and provided that the Company is not otherwise required to be dissolved and wound up, within 90 days after the occurrence of the event that terminated the continued membership of the last remaining Member, the legal representative of the last remaining Member agrees in writing to continue the Company and (i) to become a Member; or (ii) to the extent that the last remaining Member assigned its interest in the Company, to cause the Member's assignee to become a Member of the Company, effective as of the occurrence of the event that terminated the continued membership of the last remaining Member;

(v)     The sale or transfer of all or substantially all of the Company's assets;

(vi)     A merger or consolidation of the Company with one or more entities in which the Company is not the surviving entity.

8.2 No Automatic Dissolution Upon Certain Events. Unless otherwise set forth in this Agreement or required by applicable law, the death, incapacity, disassociation, bankruptcy, or withdrawal of a Member will not automatically cause a dissolution of the Company.

ARTICLE 9: INDEMNIFICATION

9.1 Indemnification. The Company has the power to defend, indemnify, and hold harmless any Person who was or is a party, or who is threatened to be made a party, to any Proceeding (as that term is defined below) by reason of the fact that such Person was or is a Member, officer, employee, representative, or other agent of the Company, or was or is serving at the request of the Company as a director, Governor, officer, employee, representative or other agent of another limited liability company, corporation, partnership, joint venture, trust, or other enterprise (each such Person is referred to as a "Company Agent"), against Expenses (as that term is defined below), judgments, fines, settlements, and other amounts (collectively, "Damages") to the maximum extent now or hereafter permitted under Tennessee law. "Proceeding," as used in this Article 9, means any threatened, pending, or completed action, proceeding, individual claim or matter within a proceeding, whether civil, criminal, administrative, or investigative. "Expenses," as used in this Article 9, includes, without limitation, court costs, reasonable attorney and expert fees, and any expenses incurred relating to establishing a right to indemnification, if any, under this Article 9.

9.2 Mandatory. The Company must defend, indemnify and hold harmless a Company Agent in connection with a Proceeding in which such Company Agent is involved if, and to the extent, Tennessee law requires that a limited liability company indemnify a Company Agent in connection with a Proceeding.

9.3 Expenses Paid by the Company Prior to Final Disposition. Expenses of each Company Agent indemnified or held harmless under this Agreement that are actually and reasonably incurred in connection with the defense or settlement of a Proceeding may be paid by the Company in advance of the final disposition of a Proceeding if authorized by a vote of the Members that are not seeking indemnification holding a majority of the Voting Interests (excluding the Voting Interest of the Company Agent seeking indemnification). Before the Company makes any such payment of Expenses, the Company Agent seeking indemnification must deliver a written undertaking to the Company stating that such Company Agent will repay the applicable Expenses to the Company unless it is ultimately determined that the Company Agent is entitled or required to be indemnified and held harmless by the Company (as set forth in Sections 9.1 or 9.2 above or as otherwise required by applicable law).

MAR 1 6 2022

ARTICLE 10: GENERAL PROVISIONS

10.1 Notice. (a) Any notices (including requests, demands, or other communications) to be sent by one party to another party in connection with this Agreement must be in writing and delivered personally, by reputable overnight courier, or by certified mail (or equivalent service offered by the postal service from time to time) to the following addresses or as otherwise notified in accordance with this Section: (i) if to the Company, notices must be sent to the Company's principal executive office; and (ii) if to a Member, notices must be sent to the Member's last known address for notice on record. (b) Any party to this Agreement may change its notice address by sending written notice of such change to the Company in the manner specified above. Notice will be deemed to have been duly given as follows: (i) upon delivery, if delivered personally or by reputable overnight carrier or (ii) five days after the date of posting if sent by certified mail.

10.2 Entire Agreement; Amendment. This Agreement along with the Articles of Organization (together, the "Organizational Documents"), constitute the entire agreement among the Members and replace and supersede all prior written and oral understandings and agreements with respect to the subject matter of this Agreement, except as otherwise required by the Tennessee Revised Limited Liability Company Act. There are no representations, agreements, arrangements, or undertakings, oral or written, between or among the Members relating to the subject matter of this Agreement that are not fully expressed in the Organizational Documents. This Agreement may not be modified or amended in any respect, except in a writing signed by all of the Members, except as otherwise required or permitted by the Tennessee Revised Limited Liability Company Act.

10.3 Governing Law; Severability. This Agreement will be construed and enforced in accordance with the laws of the state of Tennessee. If any provision of this Agreement is held to be unenforceable by a court of competent jurisdiction for any reason whatsoever, (i) the validity, legality, and enforceability of the remaining provisions of this Agreement (including without limitation, all portions of any provisions containing any such unenforceable provision that are not themselves unenforceable) will not in any way be affected or impaired thereby, and (ii) to the fullest extent possible, the unenforceable provision will be deemed modified and replaced by a provision that approximates the intent and economic effect of the unenforceable provision and the Agreement will be deemed amended accordingly.

10.4 Further Action. Each Member agrees to perform all further acts and execute, acknowledge, and deliver any documents which may be reasonably necessary, appropriate, or desirable to carry out the provisions of this Agreement.

10.5 No Third-Party Beneficiary. This Agreement is made solely for the benefit of the parties to this Agreement and their respective permitted successors and assigns, and no other Person or entity will have or acquire any right by virtue of this Agreement. This Agreement will be binding on and inure to the benefit of the parties and their heirs, personal representatives, and permitted successors and assigns.

10.6 Incorporation by Reference. The recitals and each appendix, exhibit, schedule, and other document attached to or referred to in this Agreement are hereby incorporated into this Agreement by reference.

10.7 Counterparts. This Agreement may be executed in any number of counterparts with the same effect as if all the Members signed the same copy. All counterparts will be construed together and will constitute one agreement.

[Remainder Intentionally Left Blank.]


     IN WITNESS WHEREOF, the parties have executed or caused to be executed this Operating Agreement and do each hereby represent and warrant that their respective signatory, whose signature appears below, has been and is, on the date of this Agreement, duly authorized to execute this Agreement.


Dated: _____Mar 07, 2022_____

*Krystal Whaley*

Signature of Krystal Whaley

MAR 1 6 2022

EXHIBIT A MEMBERS

The Members of the Company and their respective addresses, Capital Contributions, and Ownership Interests are set forth below. The Members agree to keep this Exhibit A current and updated in accordance with the terms of this Agreement, including, but not limited to, Sections 2.1, 2.3, 2.4, 7.1, 7.2, and 10.1.

| Members | Capital Contribution | Percentage Interest |
|---|---|---|
| Sole - Krystal Lee Whaley<br>400 Park Rd., Ste. 210<br>Sevierville, Tennessee 37862 | | 100% |

# PACKAGE CERTIFICATE



BROKER MINT

---

## OPERATING AGREEMENT. WRCRL.PDF                                    11 pages

Operating Agreement. WRCRL.pdf                                        11 pages

---

## E-SIGN INFO

| Status: | SIGNED | | Originator: | Krystal Whaley |
|---------|--------|---|---|---|

**Originator:** Krystal Whaley
krystalwhaley@protonmail.com
IP: 172.58.193.44
Domain: southernliving.brokermint.com
Date: Mar 07, 2022 01:59 PM

**Package ID:** C0284D87893B934A3F3A08AA14DAFF59

**Time zone:** EST (UTC-5)

**Signers:**



(KW) **Krystal Whaley**   krystalwhaley@protonmail.com   Signed   Mar 07, 2022 01:59 PM   *Krystal Whaley*
Krystal Whaley   IP: 172.58.193.44                                 id: bbbab0001d19df1954e1940408b6b92b

---

## HISTORY

| Mar 07, 2022 | 01:59 PM | (KW) | Krystal Whaley | krystalwhaley@protonmail.com | IP: 172.58.193.44 | Viewed |
| Mar 07, 2022 | 01:59 PM | (KW) | Krystal Whaley | krystalwhaley@protonmail.com | IP: 172.58.193.44 | Signed |
| Mar 07, 2022 | 01:59 PM | | Package has been fully signed and sealed | | | Completed |

MAR 1 6 2022

# STATE *of* TENNESSEE
## STATEMENT *of the* ORGANIZER
## A LIMITED LIABILITY COMPANY

The undersigned, the Organizer of WHALEY REALTY CRL LLC, who signed and filed its Articles of Organization (or similar organizing document) with the Tennessee Secretary of State, appoints the following individuals to serve as members of the limited liability company:

Name and Address of each Initial Member:

Krystal Whaley
400 Park Road Ste 210- Fountain Park
Sevierville, CA 37862

**Dated:** July 23rd, 2014

**Marsha Siha, Organizer**

# OPERATING AGREEMENT

# FOR

# KLW MANAGEMENT, LLC

### Recitals

KLW MANAGEMENT, LLC, a South Dakota Limited Liability Company, has been formed as described hereinafter. The parties hereto as the Members and Managers of KLW MANAGEMENT, LLC enter into this Operating Agreement as their binding agreement and for all purposes permitted for an Operating Agreement under South Dakota law. Wherefore, the parties agree as follows:

## ARTICLE I
## Introduction

**Section 1.1. Formation of Limited Liability Company.** Philip Nemeth, Attorney at Law, acted as the organizer to form a South Dakota limited liability company under the laws of the State of South Dakota by the filing of Articles of Organization (the "Articles") for KLW MANAGEMENT, LLC (the "Company") pursuant to the South Dakota Limited Liability Company Act, SDCL § 47-34A-101 et seq., on behalf of KRYSTAL L. WHALEY and MAXWELL D. WOOLUMS, Members, and any and all additional and/or substituted Members under §2.8 and §6.4 hereof (hereinafter referred to collectively as the "Members"). A copy of the Articles and Certificate of Organization, reflecting filing with the South Dakota Secretary of State, are attached hereto as **Exhibit "A"**. The Company's business shall be conducted under such name until such time as all the Members shall hereafter designate otherwise and file amendments to the Articles in accordance with applicable law. For and in consideration of the mutual covenants contained herein and for good and valuable consideration, the sufficiency of which is hereby acknowledged, the parties hereto agree to the terms hereof, as the same may be amended from time to time consistent with the provisions hereof.

This Operating Agreement is subject to, and governed by, the South Dakota Limited Liability Company Act and the Articles of the Company filed with the South Dakota Secretary of State. In the event of a direct conflict between the provisions of this Operating Agreement and the mandatory provisions of the South Dakota Limited Liability Company Act or the provisions of the Articles of the Company, such provisions of the South Dakota Limited Liability Company Act or the Articles of the Company, as the case may be, will be controlling. To the extent any provision of this Agreement is prohibited or ineffective under the Act, this Agreement shall be considered amended to the smallest degree possible in order to make this Agreement effective under the Act. In the event the Act is subsequently amended or interpreted in such a way to make any provision of this Agreement that was formerly invalid thereafter valid, such provision shall be considered to be valid from the effective date of such interpretation or amendment.

**Section 1.2. Defined Terms.**  The terms used in this Agreement with their initial letters capitalized, shall, unless the context otherwise requires or unless otherwise expressly provided herein, have the meanings specified in this §1.2.  The singular shall include the plural and the masculine gender the shall include the feminine and neuter, and vice versa, as the context requires.  When used in this Agreement, the following terms shall have the meanings set forth below:

   (a) **"Act"** shall mean the South Dakota Limited Liability Company Act, as the same may be amended from time to time.

   (b) **"Additional Member"** shall mean any Person or Entity admitted as a Member pursuant to §2.8 hereof.

   (c) **"Administrative Manager"** or **"Administrator"** shall refer to one or more persons or entities, if any appointed by the Manager pursuant to §3.2(o) hereof. The Administrator need not be a Member of the Company.

   (d) **"Affiliate"** shall mean any individual, partnership, corporation, limited liability company, trust, or other entity or association, directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with a Member.  The term "control", as used in the immediately preceding sentence, means, with respect to a corporation the right to exercise, directly or indirectly, more than 50% of the voting rights attributable to the controlled corporation, and, with respect to any individual, partnership, trust, other entity or association, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of the controlled entity.

   (e) **"Agreement"** shall mean this Operating Agreement, as originally executed and as amended from time to time, and the terms "hereof", "hereby" and "hereunder", when used with reference to this Agreement, refer to this Agreement as a whole, unless the context otherwise requires.

   (f) **"Assignee"** or **"Transferee"** shall mean, except where the context requires otherwise, any Person or Entity to whom a Member's Interest shall have been transferred, without the consent of all Members of the Company.

   (g) **"Available Cash"** or **"Available Cash Flow"** or **"Cash Flow"** of the Company shall mean all cash funds of the Company on hand from time to time (other than cash funds obtained as contributions to the capital of the Company by the Members and cash funds obtained from loans to the Company unless expressly determined by the Manager to be considered part of Available Cash) after (i) payment of all operating expenses of the Company as of such time, (ii) provision for payment of all outstanding and unpaid current obligations of the Company as of such time, and (iii) provision for a working capital reserve in accordance with §5.2 below.

   (h) **"Bankruptcy"** shall mean, and a Member shall be deemed a "Bankrupt Member" upon (i) the entry of a decree or order for relief against the Member by a court of competent jurisdiction in any involuntary case brought against the Member under any bankruptcy, insolvency or other similar law (collectively, "Debtor Relief Laws") generally affecting the rights of creditors and relief of debtors now or hereafter in effect, (ii) the appointment of a receiver, liquidator, assignee, custodian, trustee, sequestrator or other similar agent under applicable Debtor Relief Laws for the Member or for any substantial part of its assets or property, (iii) the ordering of the winding up or liquidation of the Member's affairs, (iv)

2

the filing of a petition in any such involuntary bankruptcy case, which petition remains undismissed for a period of 180 days or which is not dismissed or suspended pursuant to Section 305 of the Federal Bankruptcy Code (or any corresponding provision of any future United States bankruptcy law), (v) the commencement by the Member of a voluntary case under any applicable Debtor Relief Law now or hereafter in effect, (vi) the consent by the Member to the entry of an order for relief in an involuntary case under any such law, or to the appointment of or the taking of possession by a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar agent under any applicable Debtor Relief Laws for the Member or for any substantial part of its assets or property, or (vii) the making by a Member of any general assignment for the benefit of its creditors.

(i) **"Capital Account"** shall mean the individual accounts established and maintained pursuant to §2.6(b) hereof.

(j) **"Capital Contribution"** shall mean the total value of cash and agreed fair market value of property and/or services contributed and agreed to be contributed to the Company by each Member, as shown in Exhibit "B", as the same may be amended from time to time. Any reference in this Agreement to the Capital Contribution of a then Member shall include a Capital Contribution previously made by any prior Member for the interest of such then Member, reduced by any distribution to such Member in return of "Capital Contribution" as contemplated herein. Additional Capital Contributions may only be made by a Member with the consent of all other Members.

(k) **"Code"** shall mean the Internal Revenue Code of 1986, as amended. All references herein to sections of the Code shall include any corresponding provision or provisions of succeeding law.

(l) **"Company"** shall refer to KLW MANAGEMENT, LLC, and any successor.

(m) **"Deficit Capital Account"** shall mean the deficit balance in a Member's Capital Account as of the end of a taxable year, adjusted as may be provided in Article V hereof.

(n) **"Dissolution Event"** shall mean an occurrence as defined in §6.1(a) of this Agreement.

(o) **"Entity"** shall mean any association, corporation, general partnership, limited partnership, limited liability company, joint stock association, joint venture, trust, business trust, cooperative, and any foreign association of like structure.

(p) **"Fiscal Year"** means the Company's fiscal year as set forth in §4.1.

(q) **"Initial Capital Contribution"** shall mean the initial contribution to the capital of the Company pursuant to this Operating Agreement.

(r) **"Initial Members"** shall refer to KRYSTAL L. WHALEY and MAXWELL D. WOOLUMS.

(s) **"Interest"** in the Company shall mean the entire ownership interest of a Member in the Company at any particular time, including the right of such Member to any and all benefits to which a Member may be entitled as provided in this Agreement and under the Act, together with the obligations of such Member to comply with all of the terms and provisions of this Agreement.

(t) **"Manager"** shall refer to one or more persons or entities acting as manager or managers for the Company as designated in §3.2 hereof. Initially, "Manager" shall mean KRYSTAL L. WHALEY, and thereafter shall mean her successors. The Manager need not be a Member of the Company.

3

(u) **"Member"** shall mean each Initial Member, and each party who hereafter may become an Additional or Substitute Member.

(v) **"Net Losses"** shall mean, for each Fiscal Year, the losses and deductions of the Company determined in accordance with accounting principles consistently applied from year to year under the accrual method of accounting and as reported, separately or in the aggregate, as appropriate, on the Company's information tax return filed for federal income tax purposes, plus any expenditures described in §705(a)(2)(B) of the Code.

(w) **"Net Profits"** shall mean, for each Fiscal Year, the income and gains of the Company determined in accordance with accounting principles consistently applied from year to year under the accrual method of accounting and as reported, separately or in the aggregate, as appropriate, on the Company's information tax return filed for federal income tax purposes, plus any income described in §705(a)(1)(B) of the Code.

(x) **"Operating Agreement"** shall mean this Agreement.

(y) **"Organization Expenses"** shall mean those expenses incurred in connection with the formation of the Company.

(z) **"Percentage Interests"** of a Member shall mean the percentage of such Member set forth opposite the name of such Member under the column "Percentage Interest" in **Exhibit "B"** hereto, as such percentage may be adjusted from time to time pursuant to the terms hereof. Percentage Interests shall be determined, unless otherwise provided herein, in accordance with the relative proportions of the Capital Accounts of the Members, effective as of the first day of the Company's Fiscal Year but with all distributions under §5.2 and §5.3 hereof to be deemed to have occurred on such day immediately prior to determination of Percentage Interest of a Member. The interests of the Members may also be shown as Units, each Unit representing 0.10%.

(aa) **"Person"** shall mean any Individual or Entity, and the heirs, executors, administrators, successors and assigns of any such Person where the context requires.

(ab) **"Pro Rata Part"** means the proportion that a Percentage Interest of a Member bears to the aggregate Interest in the Company of all Members.

(ac) **"Regulations"** means, except where the context indicates otherwise, the permanent, temporary, proposed, or proposed and temporary regulations of the Department of the Treasury under the Code as such regulations may be lawfully changed from time to time.

(ad) **"Share"** shall refer to an interest in the Company representing such rights of membership and interests in the capital and/or profits of the Company, and to be measured in such units as may be established pursuant to §2.4 hereof.

(ae) **"Substitute Member"** shall mean any Person or Entity admitted as a Member to the Company with all of the rights of a Member who has transferred all of such Member's Interest in the Company with the unanimous consent of all other Members of the Company as provided in Article VI of this Agreement.

**Section 1.3. Company Purpose.** The general purposes of the Company are as set forth in the Articles. The Company may exercise all powers reasonable or necessary to pursue its purposes. In addition, the Company may engage in and do any act concerning any or all lawful businesses for which limited liability companies may be organized according to the Act.

## ARTICLE II
### Members, Membership Interests

**Section 2.1. Names, Addresses and Capital Contributions of Members' Principal Office.**

    (a) Members (who are collectively referred to as "Members" and individually referred to as "Member"), their respective addresses, their Initial Capital Contributions to the Company, their Capital Contributions agreed to be made subsequent to their Initial Capital Contributions, if any, and their respective Percentage Interests in the Company are set forth on Exhibit "B", attached hereto and made a part hereof.

    (b) The principal office of the Company, if any, shall be as stated in the Articles, or as the Manager may otherwise determine.

**Section 2.2. Form of Contributions.**  The Initial Capital Contributions shall be in the amount as provided herein and shall consist of such assets and/or services as the parties have agreed; subsequent contributions shall be in such amounts and may be in cash or any type of property, including promissory notes, or any services performed or to be performed, as may be agreed upon by all of the Members.  No Member shall be required to make any Capital Contributions to the Company other than the Capital Contributions required to be made by such Member under §2.1(a) hereof.

**Section 2.3. Member Loans or Services.**  Loans or services by any Member to the Company shall not be considered contributions to the capital of the Company unless otherwise agreed by all Members.

**Section 2.4. Shares of Membership Interests.**  The membership Interest of the Company may be divided into Shares and classes of Shares, each Share to represent such amount of capital contributed, such right to vote and to grant or withhold consent to continuation of the business of the Company under Article VI hereof and consent to any Assignee becoming a Substitute Member, as the Members shall unanimously determine and as may be permitted by the Act.

**Section 2.5. Certificates for Membership Interests.**  The Shares of a Member or the Member's Interest in Company may be represented by a Certificate of Membership.  The exact contents of a Certificate of Membership may be determined by the Manager.  Certificates of Membership, if any, issued pursuant to this §2.5 are for the convenience of the Company and Members for internal record keeping purposes only.  The fact that such a Certificate has been issued by the Company to a Member shall not be deemed to constitute transferable evidence of a Member's Ownership Interest in the Company.  Each such Certificate, if any, issued by the Company shall contain the words "Non-Transferable" prominently displayed thereon.

**Section 2.6. Capital and Capital Accounts.**

    (a) The Initial Capital Contribution of each Member shall be as set forth on **Exhibit "B"**.  No interest shall be paid on any Capital Contribution.

(b) An individual capital account (the "Capital Account") shall be established and maintained on behalf of each Member, including any additional or substituted Member who shall thereafter receive an Interest in the Company. The Capital Account of each Member shall consist of (i) the amount of cash such Member has contributed to the Company, plus (ii) the fair market value of any property such Member has contributed to the Company, net of any liabilities assumed by the Company or to which such property is subject as provided under Section 752 of the Code, plus (iii) the amount of profits, income or gain (including tax-exempt income) allocated to such Member, less (iv) the amount of losses and deductions allocated to such Member, less (v) the amount of all cash distributed to such Members, less (vi) the fair market value of any property distributed to Member, net of any liability assumed by such Member or to which such property is subject, less (vii) such Member's share of any other expenditures which are not deductible by the Company for federal income tax purposes or which are not allowable as additions to the basis of Company property, and (viii) subject to such other adjustments as may be required under the Code.

(c) No Member shall have the right to withdraw the Member's Capital Contribution or to demand and receive property of the Company or any distribution in return for the Member's Capital Contribution, except as may be specifically provided in this Agreement or required by law (excluding any law which grants such a right in the absence of a negating provision in this Agreement). No Member shall receive out of Company property any part of the Member's Capital Contribution until (i) all liabilities of the Company, except liabilities to Members on account of their Capital Contributions, have been paid or there remains property of the Company sufficient to pay them; (ii) the consent of all Members is had, unless the return of the contribution to capital may be rightfully demanded as provided in this Agreement or the Act.

(d) Subject to the provisions of Subsection (c) of this Section, a Member may rightfully demand the return of the Member's Capital Contribution only upon the dissolution and winding up of the Company.

**Section 2.7. Admission of Additional Capital.** As provided in the Articles, in order to obtain additional funds or for other business purposes, additional capital may be contributed to the Company, but only upon the written consent of all Members.

**Section 2.8. Admission of Additional Members.** As provided in the Articles, (i) the Members may admit to the Company additional Member(s) who will participate in the profits, losses, Available Cash Flow, and ownership of the capital of the Company on such terms as are determined by all of the Members; (ii) admission of any such additional Member(s) shall require the written consent of all Members then having any Interest in the Company; and (iii) admission of such additional Member(s) may result in a dilution of the Interests of the then Members.

**Section 2.9. Limitation on Liability.** No Member or Manager (as hereinafter defined) shall be liable under a judgment, decree, or order of the court, or in any other manner, for a debt, obligation or liability of the Company, except as provided by law or as specifically provided otherwise herein. No Member shall be required to loan any funds to the Company. No Member shall be required to make any contribution to the Company by reason of any negative balance in the Member's Capital Account, nor shall any negative balance in a Member's Capital Account create any liability on the part of the Member to any third party.

**Section 2.10. No Individual Authority.**  No Member that is not a Manager, acting alone, shall have any authority to act for, or to undertake or assume, any obligation, debt, duty or responsibility on behalf of, any other Member or the Company.

**Section 2.11. No Member Responsible for Other Member's Commitment.**  In the event that any Member (or any of such Member's shareholders, or Affiliates) has incurred any indebtedness or obligation prior to the date hereof that relates to or otherwise affects the Company, neither the Company nor any other Member shall have any liability or responsibility for or with respect to such indebtedness or obligation unless such indebtedness or obligation is assumed by the Company pursuant to a written instrument signed by all Members.  Furthermore, neither the Company nor any Member shall be responsible or liable for any indebtedness or obligation that is hereafter incurred by any other Member (or any of such Member's shareholders or Affiliates).  In the event that a Member (or any of such Member's shareholders or Affiliates (collectively, the "liable Member"), whether prior to or after the date hereof, incurs (or has incurred) any debt or obligation that neither the Company nor the other Members is to have any responsibility or liability for, the liable Member shall indemnify and hold harmless the Company and the other Members from any liability or obligation the liable Member may incur in respect thereof.

### ARTICLE III
### Management and Control of Business

**Section 3.1. Management Vested in Manager.**
    (a) As contemplated in the Articles, management of the Company shall be vested in one (1) or more managers, who may be elected by the Members annually or as otherwise provided in this Article III (whether one or more, the "Manager").  In the event there shall be more than one Manager, the powers and duties of the Manager as set forth herein and in the Act shall be allocated, divided and vested among the Managers as they shall deem appropriate to the extent permitted by the Act.  All powers of the Company shall be exercised by or under the authority of, and the business and affairs of the Company shall be managed under the direction of, the Manager, unless otherwise provided in the Act, the Articles, or this Agreement.  The Members and Manager or any of their Affiliates may engage in other activities of any nature.  The Manager need not be a Member, an individual, a resident of the State of South Dakota, or a citizen of the United States.
    (b) If required by law, the Manager shall be qualified to do business in South Dakota by obtaining a certificate of authority to do so from the Secretary of State of the State of South Dakota.

**Section 3.2. Powers of Manager.**  Without limiting the generality of §3.1., a Manager shall have power and authority, on behalf of the Company and subject to the limitations set forth hereinafter:

    (a) To acquire property from any Person or Entity as the Manager may determine.  The fact that a Member is directly or indirectly affiliated or connected with any such Person or Entity shall not prohibit a Manager from dealing with that Person or Entity.

(b) To borrow money for the Company from banks, other lending institutions, the Members, or Affiliates of the Members or Manager on such terms as they deem appropriate, and in connection therewith, to hypothecate, encumber and grant security interests in the assets of the Company to secure repayment of the borrowed sums. Except as otherwise provided in the Act, no debt shall be contracted or liability incurred by or on behalf of the Company except by the Company's Manager.

(c) To purchase liability and other insurance to protect the Company's property and business.

(d) To hold and own any company real and/or personal properties in the name of the Company.

(e) To invest any Company funds temporarily (by way of example but not limitation) in time deposits, short-term governmental obligations, commercial paper or other investments.

(f) Upon the affirmative vote of the Members holding at least 99% of all Percentage Interests in the Company, to sell or otherwise dispose of all or substantially all of the assets of the Company as part of a single transaction or plan so long as such disposition is not in violation of or a cause of a default under any other agreement to which the Company may be bound.

(g) To execute on behalf of the Company all instruments an documents, including, without limitation, annual or other periodic reports and other filings required to be made to the South Dakota Secretary of State or other governmental entities, checks; drafts; notes and other negotiable instruments; mortgages or deeds of trust; security agreements; financing statements; documents providing for the acquisition, mortgage or disposition of the Company's property; assignments; bills of sale; leases; partnership agreements; and any other instruments or documents necessary, in the opinion of the Manager, to the business of the Company.

(h) To employ accountants, legal counsel, managing agents or other experts to perform services for the Company, and to define their duties and authority, which may include authority granted to the Manager under the Act, and to compensate them from Company funds.

(i) To retain and compensate employees and agents generally, and to define their duties and authority, which may include authority granted to the Manager under the Act or the Articles of the Company or this Agreement, and to cause the same to be the employees or agents of the Manager rather than of the Company if the Manager determines such manner of retention and compensation is in or not opposed to the best interests of the Company.

(j) To appoint and remove officers of the Company if the Members shall not have acted under §3.3(i) to do so.

(k) To enter into any and all other agreements on behalf of the Company, with any other Person or Entity for any purpose, in such forms as the Members or any Member may approve.

(l) To do and perform all other acts as may be necessary or appropriate to the conduct of the Company's business.

(m) The powers of the Manager shall be limited if the Manager's conduct could result in a change in the amount or character of Company's contributions to capital, a change in the character of the business of Company, or a false or erroneous statement in the Articles. Such changes which may result from conduct of the Manager will require written consent by all Members, an amendment to the Articles, and a filing of the amendment with the Secretary of State of South Dakota.

(n) Every contract, deed, mortgage, lease and other instrument executed by the Manager shall be conclusive evidence in favor of every person relying thereon or claiming thereunder that at the time of the delivery thereof (i) the Company was in existence (ii) neither this Agreement nor the Articles had been amended in any manner so as to restrict the delegation of authority among Members or the Manager and (iii) the execution and delivery of such instrument was duly authorized by the Members and/or Manager. Any person may always rely on a certificate addressed to him and signed by any Manager hereunder:

(i) as to who are the Members or Manager hereunder;

(ii) as to the existence or non-existence of any fact which constitutes a condition precedent to acts by the Members or the Manager or in any other manner germane to the affairs of the Company;

(iii) as to who is authorized to execute and deliver any instrument or document of the Company;

(iv) as to the authenticity of any copy of the Articles, this Agreement, amendments thereto and any other document relating to the conduct of the affairs of the Company; or

(v) as to any act or failure to act by the Company or as to any other matter whatsoever involving the Company, any Manager or any Member in the capacity as a Member or Manager of the Company.

(o) The Manager may appoint one or more Administrative Managers to assist the Manager in the performance of the Managers duties in the active management and business affairs of the Company, subject to the directions of the Manager.

### Section 3.3. Meetings of Members.

(a) Annual meetings of the Members may be held each year in December in such place or places as the Manager may determine. Unless otherwise provided herein, or in the Articles or the Act, no annual meeting shall be held until such time as Members holding 99% of the voting rights described herein shall request that the Manager call the same annually thereafter. Special meetings of the Members, as provided in Subsection (d) of this Section, may be called by Members representing in the aggregate more than 50% of the Percentage Interests in the Company.

(b) The Company shall deliver or mail written notice stating the date, time, and place of any meeting of Members and, in the case of a special Members' meeting or when otherwise required by law, a description of the purposes for which the meeting is called, to each Member of record entitled to vote at the meeting, at such address as appears in the records of the Company, such notice to be mailed at least ten (10), but not more than sixty (60), days before the date and time of the meeting. A Member may waive notice of any meeting, before or after the date of the meeting, by delivering a signed waiver to the Company for inclusion in the minutes of the Company. A Member's attendance at any meeting, in person or by proxy (i) waives objection to lack of notice or defective notice of the meeting, unless the Member at the beginning of the meeting objects to holding the meeting or transacting business at the meeting, and (ii) waives objection to consideration of a particular matter at the meeting that is not within the purposes described in the meeting notice, unless the Member objects to considering the matter when it is presented.

(c) The record date for the purpose of determining the Members entitled to notice of a Members' meeting, for demanding a special meeting, for voting, or for taking any other action shall be the tenth (10th) day prior to the date of the meeting or other action.

(d) A Member may appoint a proxy to vote or otherwise act for the Member pursuant to a written appointment form executed by the Member or the Member's duly authorized attorney-in-fact.  An appointment of a proxy is effective when received by the Manager of the Company.  The general proxy of a fiduciary is given the same effect as the general proxy of any other Member.  A proxy appointment is valid for eleven (11) months unless otherwise expressly stated in the appointment form.

(e) At any meeting of Members, each Member entitled to vote shall have a number of votes equal to the product of (i) the Member's Percentage Interest as set forth on **Exhibit "B"** hereto, as the same may be amended from time to time, times (ii) one hundred (100).  At any meeting of Members, presence of Members entitled to cast at least 51% of the total votes of all Members entitled to vote at such meeting constitutes a quorum.  Action on a matter is approved if it receives approval by at least 99% of the total number of votes entitled to be cast by all Members in the Company entitled to vote at such meeting or such greater number as may be required hereunder or under the Act or the Articles for the particular matter under consideration.  Upon the occurrence of a Dissolution Event (as defined herein), a Former Member shall not be entitled to any vote in determining whether the Company shall purchase the interest of such Former Member as permitted in Section 6.1 hereof.  Also, any Assignee of a Member's Interest in the Company shall not be entitled to vote or participate on any matters at any meeting unless such Assignee becomes a Substitute Member as contemplated in §6.4 hereof.

(f) Subject to Subsection (d) of this Section and the applicable laws of the State of South Dakota, any action required or permitted to be taken at a Members' meeting may be taken without a meeting if the action is taken by all of the Members entitled to vote on the action.  The action must be evidenced by one or more written consents describing the action to be taken, signed by all the Members entitled to vote on the action, and delivered to the Company for inclusion in the minutes.  The record date for determining Members entitled to take action without a meeting is the first date a Member signs the consent to such action.

(g) Any or all Members may participate in any annual or special Members' meeting by, or through the use of, any means of communication by which all Members participating may simultaneously hear each other during the meeting.  A Member so participating is deemed to be present in person at the meeting.

(h) At any annual or special Members' meeting the Manager shall appoint a person to preside at the meeting and a person to act as secretary of the meeting.  The secretary of shall prepare minutes of the meeting which shall be placed in the minute books of the Company.

(i) The Members may elect officers at an annual or special Members' meeting.  The officers of the Company, if deemed necessary by the Manager or the Members, shall be president, vice president, secretary and treasurer.  Each officer shall hold office for the term for which he is elected until his successor has been elected or until removed as otherwise permitted herein.  Any individual may hold any number of offices.  No officer need be a Member, Manager, resident of the State of South Dakota or citizen of the United States.  If a Manager is a corporation, such corporation's officers may serve as officers of Company if so elected or appointed.  Any officer elected may be removed whenever it is judged to be in the best interest of the Company.

(j) Assistant officers may be elected by the Members or by the Manager at any time. Assistant officers need not be a Member, Manager or resident of the State of South Dakota or a citizen of the United States. Each assistant officer shall perform such duties as shall be delegated by the officer for whom the assistant holds office to assist. Any assistant officer may be removed at any time.

(k) In the event the Company shall fail to hold an annual meeting which otherwise shall have been required hereunder or pursuant to the Act, the actions of the Company and the Manager shall not be invalidated thereby. The Manager shall remain in office until such time as an election shall lawfully be held.

**Section 3.4. Reimbursement of Expenses.** Any Manager shall be entitled to reimbursement from the Company of all expenses of the Company reasonably incurred and paid by such Manager on behalf of the Company. Reimbursement of such expenses shall be made to a Member only if the Member shall have made the Initial Capital Contribution and all subsequent Capital Contributions otherwise required of such Member and as may be shown on **Exhibit "B"** attached hereto. Any reimbursement pursuant hereto shall be treated as an expenditure of the Company and shall not be treated as a distribution to the reimbursed Member.

**Section 3.5. Organization Expenses.** The Company shall pay all expenses incurred in connection with the formation and organization of the Company. Such expenses as shall have been incurred in connection with the formation and organization of the Company shall include, without limitation, reasonable fees of legal counsel and accountants retained by the Organizer or Manager, licensing and registration fees and deposits, required travel expenses, and other like expenses.

**Section 3.6. Manager Compensation.** The Manager shall receive a management fee or other compensation as may be established by the affirmative vote of Members holding at least 99% of all Percentage Interests in the Company. The Manager shall not be prevented from receiving such compensation by reason of the fact that the Manager is also a Member of the Company. In all events the Manager shall be reimbursed for all expenses advanced by the Manager on behalf of the Company.

**Section 3.7. Manager Has No Exclusive Duty to Company.** A Manager shall not be required to manage the Company as the Manager's sole and exclusive function and the Manager may have other business interests and may engage in other activities in addition to those relating to the Company, including activities competitive with the business of the Company. Neither the Company nor any Member shall have any right, by virtue of this Agreement, to share or participate in such other investments or activities of the Manager or to the income or proceeds derived therefrom.

**Section 3.8. Resignation of Manager.** Any Manager of the Company may resign at any time by giving written notice to the Members of the Company. The resignation of any Manager shall take effect upon receipt of notice thereof or at such later time as shall be specified in such notice; and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

**Section 3.9. Vacancies.**   Any vacancy occurring for any reason in the number of Managers of the Company may be filled by the affirmative vote of Members holding at least 99% of Percentage Interests in the Company.   Any Manager's position to be filled by reason of Members holding at least 99% of all Percentage Interests in the Company at an annual meeting or at a special meeting of Members called for that purpose or by the Members' unanimous written consent.   A Manager elected to fill a vacancy shall be elected for the unexpired term of the Manager's predecessor in office and shall hold office until the expiration of such term and until the Manager's successor shall be elected and shall qualify or until the Manager's earlier death, resignation, dissolution or removal.   A Manager chosen to fill a position resulting from an increase in the number of Managers shall hold office until the next annual meeting of Members and until the Manager's successor shall be elected and shall qualify, or until the Manager's earlier death, resignation, dissolution or removal.

**Section 3.10. Extraordinary Matters.**   The Manager shall not have authority hereunder to cause the Company to engage in extraordinary transactions as set forth in this §3.10.   Certain extraordinary transactions shall require the affirmative vote of the Members in addition to the concurrence of the Manager, including but not limited to the following:

(a) The sale, exchange or other disposition of all, or substantially all, of the Company's assets occurring as part of a single transaction or plan shall require the affirmative vote of Members holding at least 99% of all Percentage Interests in the Company.

(b) The merger of the Company with any other limited liability company, limited partnership or general partnership shall require the affirmative vote of Members holding at least 99% of all Percentage Interests in the Company, and the merger of the Company with another corporation shall require the unanimous vote of all Members of the Company.

(c) The amendment of this Agreement shall require the unanimous agreement of all Members as otherwise provided in §9.12 hereof.

(d) Any other transaction described herein as requiring a vote of the Members.

**Section 3.11. Removal of Manager.**   A Manager may be removed prior to an annual meeting only for cause at a special meeting of Members called expressly for such purpose.

**Section 3.12. Initial Manager.**   The initial Manager of the Company shall be KRYSTAL L. WHALEY who shall serve as Manager until such time as a successor or successors shall be elected and qualified.

## ARTICLE IV
### Accounting and Records

**Section 4.1. Records and Accounting.**   The books and records of the Company shall be kept, and the financial position and the results of its operations recorded, at the expense of the Company in accordance with the accounting methods elected to be followed by the Company for federal income tax purposes.   The books and records of the Company shall reflect all Company

transactions and shall be appropriate and adequate for the Company's business. The Manager shall maintain and preserve, during the term of the Company, and for five (5) years thereafter, all such books and records. The Fiscal Year of the Company for financial reporting and for federal income tax purposes shall be the calendar year.

**Section 4.2. Access to Accounting Records.** All books and records of the Company shall be maintained at any office of the Company or at the Company's principal place of business, and each Member, and the Member's duly authorized representative, shall have access to them at such office of the Company and the right to inspect and copy them at reasonable times.

**Section 4.3. Monthly, Annual and Tax Information.** The Manager shall use its best efforts to cause the Company to deliver to each Member within ninety (90) days after the end of each Fiscal Year all information necessary for the preparation of such Member's federal income tax return. The Manager shall also use its best efforts to cause the Company to prepare, within one hundred twenty (120) days after the end of each Fiscal Year, a financial report of the Company for such Fiscal Year, containing a balance sheet as of the last day of the year then ended, an income statement for the year then ended, a statement of sources and applications of funds, and a statement of reconciliation of the capital accounts of the Members. The Manager shall also use its best efforts to cause the Company to deliver a balance sheet and income statement on a quarterly basis, no later than thirty (30) days following the close of each calendar quarter.

**Section 4.4 Accounting Decisions.** All decisions as to accounting matters, except as otherwise specifically set forth herein, shall be made by the Manager. The Members may rely upon the advice of their accountants as to whether such decisions are in accordance with accounting methods followed for federal income tax purposes.

**Section 4.5. Federal Income Tax Elections.** The Company through the Manager may make all elections for federal income tax purposes, including, but not limited to, the following:

(a) To the extent permitted by applicable law and regulations, elect to use an accelerated depreciation method on any depreciable unit of the assets of the Company; and

(b) In case of a transfer of all or part of the Company Interest of any Member, the Company may elect, pursuant to §734, §743 and §754 of the Code, as amended (or corresponding provisions of future law) to adjust the basis of the assets of the Company.

**Section 4.6. Other Records.** At the expense of the Company, the Manager shall maintain records at the principal office of the Company or such other place as the Manager may determine which shall include the following:

(a) A current list of the full name and last known business, residence or mailing address of each Member and Manager, both past and present.

(b) A copy of the Articles of Organization of the Company and all amendments thereto, together with executed copies of any Powers of Attorney pursuant to which any amendment has been executed.

(c) Copies of the Company's federal, state and local income tax returns and reports, if any, for the four (4) most recent years.

(d) Copies of the Company's currently effective written Operating Agreement, copies of any writings permitted or required with respect to a Member's obligation to contribute cash, property or services, and copies of any financial statements of the Company for the three (3) most recent years.

(e) Minutes of every annual, special and court-ordered meeting.

(f) Any written consents obtained from Members for actions taken by Members without a meeting.

(g) Copies of any offering memoranda and exhibits thereto which theretofore had been delivered to any Member of the Company in connection with any offer by the Company or Manager to accept Capital Contributions in exchange for Percentage Interests in the Company, together with all regulatory filings made in connection therewith.

## ARTICLE V
### Allocations, Distributions and Interests

**Section 5.1. Allocation of Net Profits, Net Loss or Capital Gains.**  Subject to the provisions of §704(c) of the Code, the net income, net loss or capital gains of the Company for each Fiscal Year of the Company shall be allocated to the Members, pro rata in accordance with their Percentage Interest.  The Net Profits, Net Losses and capital gains of the Company for each Fiscal Year shall be allocated according to Percentage Interests as defined herein and as adjusted with respect to distributions under §5.2 and §5.3 hereof, without proration and with such Percentage Interest applied to determine such items of Company income, loss and deduction throughout the entire taxable year.

**Section 5.2. Distribution of Available Cash.**  Periodically, but not less frequently than annually, the Available Cash of the Company, if any, shall be distributed to the Members in accordance with their Percentage Interest, provided that any Member not drawing a pro rata share of available cash shall not be deemed to have contributed the same to capital and shall be entitled to draw the same at such time as the Members determine and prior to the winding up of the Company. For any Fiscal Year, Available Cash of the Company need not be distributed to the extent that such cash is required for a reasonable working capital reserve for the Company, the amount of such reasonable working capital reserve to be determined in the sole discretion of the Manager whose decision shall be binding upon all Members.  Notwithstanding the foregoing, the Manager shall cause to be distributed no later than April 15th of the year following the close of the Company's taxable year an amount equal to the maximum tax liability to which the Manager reasonably may expect any Member of the Company to be subjected on account of the Net Profits of the Company or any capital gains of the Company, assuming that the highest bracket for United States Federal income tax purposes may be applied, together with the highest bracket for state income tax purposes of any state in which a Member may reside may be applied.  The amount so determined shall then be deemed "Available Cash" of the Company and shall be distributed unless Members holding a 100% of the Percentage Interest of the Company, together with the Manager, determine that such amount reasonably cannot be distributed because of capital requirements of the Company, or unless distribution of the same would cause the Company to violate any agreement to which it is a party.

**Section 5.3. Adjustments of Percentage Interest for Distributions.**  Any foregone distributions of Available Cash retained in the Capital Account of a Member may not be withdrawn thereafter by the Member without the agreement of the Manager.  Nothing herein is intended to cause any foregone distribution of Available Cash to be deemed a Capital Contribution for purposes of the Act, or any successor or comparable provision.

**Section 5.4. Allocation of Income and Loss and Distributions in Respect of Interests Transferred.**

(a) If any Interest in the Company is transferred, or is increased or decreased by reason of the admission of a new Member or otherwise, during any Fiscal Year of the Company, each item of income, gain, loss, deduction, or credit of the Company for such Fiscal Year shall be assigned pro rata to each day in the particular period of such Fiscal Year to which such item is attributable (i.e., the day on or during which it is accrued or otherwise incurred) and the amount of each such item so assigned to any such day shall be allocated to the Member based upon the Member's respective Interest in the Company at the close of such day.  For the purpose of accounting convenience and simplicity, the Company may treat a transfer of, or an increase or decrease in, an Interest in the Company which occurs at any time during a semi-monthly period (commencing with the semi-monthly period including the date hereof) as having been consummated on the first day of such semi-monthly period, regardless of when during such semi-monthly period such transfer, increase, or decrease actually occurs (i.e., sales and dispositions made during the first fifteen (15) days of any month will be deemed to have been made on the 16th day of the month).

(b) Distributions of Company assets in respect of an Interest in the Company shall be made only to the Members who, according to the books and records of the Company, are the holders of record of the Interests in respect of which such distributions are made on the actual date of distribution.  Neither the Company nor any Member shall incur any liability for making distributions in accordance with the provisions of the preceding sentence, whether or not the Company or the Member has knowledge or notice of any transfer or purported transfer of ownership of Interest in the Company which has not been approved by unanimous vote of the Members.  Notwithstanding any provision above to the contrary, gain or loss of the Company realized in connection with a sale or other disposition of any of the assets of the Company shall be allocated solely to the parties owning Interests in the Company as of the date such sale or other disposition occurs.

**Section 5.5. Distributions Upon Liquidation.**  Upon liquidation of the Company (or any Member's Interest), liquidating distributions will be made in accordance with the positive Capital Account balances of the Members, as determined after taking into account all Capital Account adjustments for the Company's taxable year during which the liquidation occurs.  Liquidation proceeds will be paid within sixty (60) days of the end of the taxable year (or, if later, within ninety (90) days after the date of the liquidation).

**Section 5.6. Special Allocations to Capital Accounts.**  Notwithstanding any other provisions of this Article V:

(a) No allocations of loss, deduction and/or expenditures described in §705(a)(2)(B) of the Code shall be charged to the Capital Accounts of any Member if such allocation would cause or increase a Deficit Capital Account of such Member. The amount of the loss, deduction and/or Code §705(a)(2)(B) expenditure which would have caused or increased a Deficit Capital Account of any Member shall instead be charged to the Capital Accounts of any Members which would not have a Deficit Capital Account as a result of the allocation, in proportion to their respective Capital Contributions, or, if no such Members exist, then to the Members in accordance with their interests in the Company.

(b) In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in §1.704- 1(b)(2)(ii)(d)(4), (5), or (6) of the Treasury Regulations, which create or increase a Deficit Capital Account of such Member, then items of Company income and gain (consisting of a pro rata portion of each item of Company income, including gross income, and gain for such year and, if necessary, for subsequent years) shall be specially credited to the Capital Account of such Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Deficit Capital Account so created as quickly as possible. It is the intent that this §5.6(b) be interpreted to comply with the alternate test for economic effect set forth in §1.704-1(b)(2)(ii)(d) of the Treasury Regulations.

(c) Notwithstanding any other portion of this §5.6, if during a taxable year of the Company there is a net decrease in partner (Member) non-recourse debt minimum gain, as defined in Treasury Regulation §1.704-2(i)(3), then each Member with a share of that partner (Member) non-recourse debt minimum gain shall be allocated items of income (including gross income) and gain for such year (and if necessary for subsequent years) equal to that Member's share of the net decrease in partner (Member) non-recourse debt minimum gain.

(d) Notwithstanding any other portion of this §5.6, if there is a net decrease in the Company's minimum gain as defined in Treasury Regulations §1.704-2(d) during a taxable year of the Company, then, the Capital Accounts of each Member shall be allocated items of income (including gross income) and gain for such year (and if necessary for subsequent years) equal to that Member's share of the net decrease in Company minimum gain. This §5.6(d) is intended to comply with the minimum gain chargeback requirement of §1.704-2 of the Treasury Regulations and shall be interpreted consistently therewith.

(e) Items of Company loss, deduction and expenditures described in §705(a)(2)(B) which are attributable to any non-recourse debt of the Company and are characterized as partner non-recourse deductions under §1.704-2(i) of the Treasury Regulations shall be allocated to the Members' Capital Accounts in accordance with said §1.704-2(i) of the Treasury Regulations.

(f) Beginning in the first taxable year in which there are allocations of "non-recourse deductions" (as described in §1.704-2(b) of the Treasury Regulations), such deductions shall be allocated to the Members in accordance with, and as a part of, the allocations of Company profit or loss for such period.

(g) Any credit or charge to the Capital Accounts of the Members pursuant to §5.6(a), (b), (c), (d), (e) and/or (f) hereof shall be taken into account in computing subsequent allocations of profits and losses pursuant to §5.1, so that the net amount of any items charged or credited to Capital Accounts pursuant to §5.1 and §5.6 shall, to the extent possible, be equal to the net amount that would have been allocated to the Capital Account of each Member pursuant

16

to the provisions of this Article V if the special allocations required by §5.6(a), (b), (c), (d), (e) and/or (f) hereof had not occurred.

(h) In accordance with §704(c)(1)(A) of the Code and §1.704-1(b)(2)(iv) of the Treasury Regulations, if a Member contributes property with a fair market value that differs from its adjusted basis at the time of contribution, income, gain, loss and deductions with respect to the property shall, solely for federal income tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company and its fair market value at the time of contribution. Pursuant to §704(c)(1)(B) of the Code, if any contributed property described above is distributed by the Company other than to the contributing Member within five (5) years of being contributed, then, except as provided in §704(c)(2) of the Code, the contributing Member shall be treated as recognizing gain or loss from the sale of such property in an amount equal to the gain or loss that would have been allocated to such Member under §704 (c)(1)(A) of the Code if the property had been sold at its fair market value at the time of the distribution.

(i) If under §1.704-1(b)(2)(iv)(f) of the Treasury Regulations, Company property that has been revalued is properly reflected in the Capital Accounts and on the books of the Company at a book value that differs from the adjusted tax basis of such property, then depreciation, depletion, amortization and gain or loss with respect to such property shall be shared among the Members in a manner that takes account of the variation between the adjusted tax basis of such property and its book value, in the same manner as variations between the adjusted tax basis and fair market value of property contributed to the Company are taken into account in determining the Members' shares of tax items under §704(c) of the Code.

(j) All recapture of income tax deductions resulting from the sale or disposition of Company property shall be allocated to the Member or Members to whom the deduction that gave rise to such recapture was allocated hereunder to the extent that such Member is allocated any gain from the sale or other disposition of such property.

**Section 5.7. Adjustments to Capital Accounts.** The manner in which Capital Accounts are to be maintained pursuant to this Agreement and §2.6 hereof is intended to comply with the requirements of Code §704(b) and the Treasury Regulations promulgated thereunder. If in the opinion of the Company's accountants the manner in which Capital Accounts are to be maintained pursuant to the provisions of §2.6 should be modified in order to comply with Code §704(b) and the Treasury Regulations thereunder, then notwithstanding anything to the contrary contained in the provisions of §2.6, the method in which Capital Accounts are maintained shall be so modified; provided, however, that any change in the manner of maintaining Capital Accounts shall not materially alter the economic agreement between or among the Members.

**ARTICLE VI**
**Changes in Members**

**Section 6.1. Death, Dissolution, Retirement or Bankruptcy of Member.**

(a) To the extent contemplated in the Act, the death, retirement, resignation, expulsion, bankruptcy or dissolution of a Member, or the occurrence of any other event which terminates the continued membership of a Member in the Company (a "Dissolution Event"),

shall dissolve the Company unless the remaining Member(s) unanimously consent to the continuation of the business of the Company ("Unanimous Consent"). Such unanimous consent need not include the consent of the Member who shall have caused the Dissolution Event (the "Former Member"), who shall thereafter be and become an Assignee.

(b) Upon the occurrence of the Dissolution Event, and the Unanimous Consent, the remaining Member(s) shall have an option to purchase such Former Member's Interest. Within thirty (30) days of the Unanimous Consent, the remaining Member(s) shall notify the Manager in writing of their desires to purchase a portion of the Former Member's Interest. The failure of any Member to submit a notice within the applicable period shall constitute an election on the part of the remaining Members not to purchase any of the Former Member's Interest. Each remaining Member shall be entitled to purchase a portion of the Former Member's Interest based on the remaining Member's Pro Rata Part on the date of the Unanimous Consent or the date of receipt of the rightful demand for the return of its Interest by the Former Member or such Former Member's trustee(s) or heir(s). In the event any remaining Member elects to purchase none or less than all of such remaining Member's Pro Rata Part of the Former Member's Interest then the Company may at its election purchase such portion of the Former Member's Interest, the unpurchased portion may be purchased by those remaining Members that elected to purchase more than their Pro Rata Part. If the remaining Members fail to purchase the entire interest of the Former Member, the same shall pass by operation of law to any Assignee or shall remain in the hands of the Former Member, subject to any right of the holder of such interest to demand payment therefor according to this Agreement or the Act. Notwithstanding any provision of this §6.1(b) to the contrary, the remaining Members may mutually agree to an allocation of the Former Member's Interest to be purchased by each of them.

(c) The Former Member's Interest shall be valued according to its book value for federal income tax purposes; provided, however, that if any party to a purchase of the same pursuant to §6.1(b) above deems the same to vary from fair market value, an appraisal may be requested. In such event, the Former Member's Interest shall equal the fair market value of such Interest as determined by agreement within sixty (60) days after the notice of the occurrence of a Dissolution Event or of a rightful demand for withdrawal to remaining Members or, in case of a failure to agree within such sixty (60) day period, as determined by an appraiser agreeable to all parties, but if a single appraiser cannot be agreed upon within such sixty (60) day period, as determined by three (3) appraisers, one selected by the Former Member or such Former Member's trustee(s) or heir(s), one selected by the remaining Member(s), and one selected by the two (2) appraisers so named. The fair market value of the Former Member's Interest in the Company shall be based upon the average of the two (2) appraisals closest in amount to each other. The party requesting such appraisal shall pay all expense of the same. The purchase price shall be paid by the Company (if all Members consent in writing) or such remaining Member(s), as the case may be, either: (i) in ten (10) equal annual installments of principal together with interest, commencing to accrue from the date of closing, at the then current Long-Term Applicable Federal Rate (the "AFR") under §1274(d) of the Code for the month in which the first payment is made (or a rate per annum equal to what the AFR would be for such month under §1274(d) of the Code if the AFR is no longer published) to fully amortize such purchase price over such ten (10) payments with the first payment being due and payable fifteen (15) days after the determination of the fair market value of the Former Member's Interest in the Company, or (ii) within fifteen (15) days after the determination of the fair market value of the Former

Member's Interest in the Company, as the Company and/or the remaining Member(s), as the case may be, may elect in their sole discretion.

**Section 6.2. Restrictions on Transfer and Assignment of Member's Interest.**  No Member shall be entitled to assign, convey, sell, encumber or in any way alienate all or any part of the Member's Interest in the Company and as a Member except with the prior written consent of all the other Members, which consent may be given or withheld, conditioned or delayed (as allowed by this Agreement or the Act), as the remaining Members may determine in their sole discretion.  Transfers in violation of this §6.2 shall only be effective to the extent set forth in §6.5(b) hereof.

**Section 6.3. Further Restrictions on Transfer.**  No Member shall assign, convey, sell, encumber or in any way alienate all or any part of the Member's Interest in the Company: (i) without registration under applicable federal and state securities laws, or unless he delivers an opinion of counsel satisfactory to the Company that registration under such laws is not required; or (ii) if the Interest to be sold or exchanged, when added to the total of all other Interests sold or exchanged in the preceding twelve (12) consecutive months prior thereto, would result in the termination of the Company under Section 708 of the Code.

**Section 6.4. Substitute Members.**  A Transferee shall have the right to become a Substitute Member if (i) the requirements of §6.2 and §6.3 hereof are met, (ii) such person executes an instrument satisfactory to the remaining Members accepting and adopting the terms and provisions of this Agreement, and (iii) such person pays any reasonable expenses in connection with the Member's admission as a Substitute Member.

**Section 6.5. Effect of Transfer.**
(a) Any permitted transfer of all or any portion of a Member's Interest in the Company will take effect on the first day of the month following receipt by the Members of written notice of transfer.  Any Transferee of an Interest in the Company shall take subject to the restrictions on transfer imposed by this Agreement.
(b) Upon any voluntary or involuntary transfer, alienation or encumbrance of a Member's Interest in the Company in violation of this Agreement, the Transferee shall have no right to participate in the management of the business and affairs of the Company or to become a Member, but such Transferee shall only be entitled to receive the share of profits or other compensation by way of income and the return of contributions to which the transferor of such Interest in the Company would otherwise be entitled, subject to all terms and provisions of this Agreement.

### ARTICLE VII
### Termination

**Section 7.1. Termination of the Company.**
(a) The Company shall be dissolved, its assets shall be disposed of, and its affairs wound up on the first to occur of the following:

(i) A determination by all of the Members that the Company should be dissolved.

(ii) The occurrence of a Dissolution Event, and the failure of the Company to obtain the Unanimous Consent of the Members.

(iii) Sale of all or substantially all of the assets of the Company outside of its ordinary course of business.

(iv) The expiration of the Company term as stated in its Articles.

(v) At such earlier time as may be provided by applicable law.

(b) In settling accounts of the Company after dissolution, the liabilities of the Company shall be entitled to payment in the following order, all as required by the Act:

(i) Those to creditors, in the order of priority as provided by law, except those to Members of the Company on account of their contributions.

(ii) Those to Members of the Company in respect of their share of the profits and other compensation by way of income on their contributions.

(iii) Those to Members of the Company in respect of their contributions to capital.

**Section 7.2. Distribution of Assets.**  Notwithstanding the provisions of §7.1(b) above:

(a) If the Company is dissolved and its affairs are to be wound up, the Manager shall (1) sell or otherwise liquidate all of the Company's assets as promptly as practicable (except to the extent the Manager may determine to distribute any assets to the Members in kind), (2) allocate any profit or loss resulting from such sales to the Members' Capital Accounts in accordance with Article V hereof, (3) discharge all liabilities of the Company (other than liabilities to Members), including all costs relating to the dissolution, winding up, and liquidation and distribution of assets, (4) establish such reserves as may be reasonably necessary to provide for contingent liabilities of the Company (for purposes of determining the Capital Accounts of the Members, the amounts of such reserves shall be deemed to be an expense of the Company), (5) discharge any liabilities of the Company to the Members other than on account of their interests in Company capital or profits, and (6) distribute the remaining assets in the following order:

(i) If any assets of the Company are to be distributed in kind, the net fair market value of such assets as of the date of dissolution shall be determined by independent appraisal or by agreement of the Members.  Such assets shall be deemed to have been sold as of the date of dissolution for their fair market value, and the Capital Accounts of the Members shall be adjusted pursuant to the provisions of Article V of this Agreement to reflect such deemed sale.

(ii) The positive balance of each Member's Capital Account as determined after taking into account all Capital Account adjustments for the Company's taxable year during which the liquidation occurs, shall be distributed to the Members, either in cash or in kind, as determined by the Manager, with any assets distributed in kind being valued for this purpose at their fair market value as determined pursuant to §7.2(a)(i).  Any such distributions to the Members in respect of their Capital Accounts shall be made in accordance with the time requirements set forth in §1.704-1(b)(2)(ii)(b)(2) of the Treasury Regulations.

(b) Notwithstanding anything to the contrary in this Agreement, upon a liquidation within the meaning of §1.704-1(b)(2)(ii)(g) of the Treasury Regulations, if any Member has a Deficit Capital Account (after giving effect to all contributions, distributions,

allocations and other Capital Account adjustments for all taxable years, including the year during which such liquidation occurs), such Member shall have no obligation to make any contribution to the capital of the Company, and the negative balance of such Member's Capital Account shall not be considered a debt owed by such Member to the Company or to any other person for any purpose whatsoever.

        (c) Upon completion of the winding up, liquidation and distribution of the assets, the Company shall be deemed terminated.

        (d) The Manager shall comply with any applicable requirements of applicable law pertaining to the winding up of the affairs of the Company and the final distribution of its assets.

        **Section 7.3. Articles of Dissolution.**   When all debts, liabilities and obligations have been paid and discharged or adequate provisions have been made therefor and all of the remaining property and assets have been distributed to the Members, Articles of Dissolution shall be executed in duplicate and verified by the person signing the Articles of Dissolution, which Articles of Dissolution shall set forth the information required by the Act.

        **Section 7.4. Filing of Articles of Dissolution.**

        (a) Duplicate originals of such Articles of Dissolution shall be delivered to the South Dakota Secretary of State.

        (b) Upon the issuance of the certificate of dissolution, the existence of the Company shall cease, except for the purpose of suits, other proceedings and appropriate action as provided in the Act.   The Manager shall have authority to distribute any Company property discovered after dissolution, convey real estate and take such other action as may be necessary on behalf of and in the name of the Company.

        **Section 7.5. Return of Contribution Non-Recourse to Other Members.**   Except as provided by law, upon dissolution, each Member shall look solely to the assets of the Company for the return of his Capital Contribution.   If the Company property remaining after the payment or discharge of the debts and liabilities of the Company is insufficient to return the cash or other property contribution of one or more Members, such Member or Members shall have no recourse against any other Member.

**ARTICLE VIII**
**Indemnification**

**Section 8.1. Indemnification of Members and Manager.**

        (a) To the greatest extent not inconsistent with the laws and public policies of South Dakota the Company shall indemnify any Member or Manager made a party to any proceeding because such individual is or was a Member or Manager, as a matter of right, against all liability incurred by such individual in connection with any proceeding; provided that it shall be determined in the specific case in accordance with Subsection (d) of this Section that indemnification of such individual is permissible in the circumstances because the individual has met the standard of conduct for indemnification set forth in Subsection (c) of this Section.   The Company shall pay for or reimburse the reasonable expenses incurred by a Member or Manager

in connection with any such proceeding in advance of final disposition thereof if (i) the individual furnishes the Company a written affirmation of the individual's good faith belief that he or she has met the standard of conduct for indemnification described in Subsection (c) of this Section, (ii) the individual furnishes the Company a written undertaking, executed personally or on such individual's behalf, to repay the advance if it is ultimately determined that such individual did not meet such standard of conduct, and (iii) a determination is made in accordance with Subsection (d) that based upon facts then known to those making the determination, indemnification would not be precluded under this Section.   The undertaking described in Subsection (a)(ii) above must be a general obligation of the individual, subject to such reasonable limitations as the Company may permit, but need not be secured and may be accepted without reference to financial ability to make repayment.   The Company shall indemnify a Member or Manager who is wholly successful, on the merits or otherwise, in the defense of any such proceeding, as a matter of right, against reasonable expenses incurred by the individual in connection with the proceeding without the requirement of a determination as set forth in Subsection (c) of this Section.   Upon demand by a Member or Manager for indemnification or advancement of expenses, as the case may be, the Company shall expeditiously determine whether the Member or Manager is entitled thereto in accordance with this Section.   The indemnification and advancement of expenses provided for under this Section shall be applicable to any proceeding arising from acts or omissions occurring before or after the adoption of this Section.

(b) The Company shall have the power, but not the obligation, to indemnify any individual who is or was an employee or agent of the Company to the same extent as if such individual was a Member or Manager.

(c) Indemnification is permissible under this Section only if (i) he conducted himself in good faith, and (ii) he reasonably believed that his conduct was in or at least not opposed to the Company's best interest; (iii) in the case of any criminal proceeding, he had no reasonable cause to believe his conduct was unlawful; and (iv) such individual is not adjudged in any such proceeding to be liable for negligence or misconduct in the performance of duty.   The termination of a proceeding by judgment, order, settlement, conviction or upon a plea of nolo contendere or its equivalent is not, of itself, determinative that the individual did not meet the standard of conduct described in this Subsection (c).

(d) A determination as to whether indemnification or advancement of expenses is permissible shall be made by any one of the following procedures:

(i) By the Members by a 99% vote consisting of Members not at the time parties to the proceeding; or

(ii) By special legal counsel selected by the Members in the manner prescribed in Subsection (d)(i) above.

(e) A Member or Manager of the Company who is a party to a proceeding may apply for indemnification from the Company to the court, if any, conducting the proceeding or to another court of competent jurisdiction.   On receipt of an application, the court, after giving notice the court considers necessary, may order indemnification if it determines:

(i) In a proceeding in which the Member of Manager is wholly successful, on the merits or otherwise, the Member or Manager is entitled to indemnification under this Section, in which case the court shall order the Company to pay the Member or Manager his or her reasonable expenses incurred to obtain such court ordered indemnification; or

(ii) The Member or Manager is fairly and reasonably entitled to indemnification in view of all the relevant circumstances, whether or not the Member or Manager met the standard of conduct set forth in Subsection (c) of this Section.

(f) Indemnification shall also be provided for an individual's conduct with respect to an employee benefit plan if the individual reasonably believed his conduct to be in the interests of the participants in and beneficiaries of plan.

(g) Nothing contained in this Section shall limit or preclude the exercise or be deemed exclusive of any right under the law, by contract or otherwise, relating to indemnification of or advancement of expenses to any individual who is or was a Member or Manager of the Company or is or was serving at the Company's request as a director, officer, partner, manager, trustee, employee, or agent of another foreign or domestic company, partnership, association, limited liability company, corporation, joint venture, trust, employee benefit plan, or other enterprise, whether for-profit or not. Nothing contained in this Section shall limit the ability of the Company to otherwise indemnify or advance expenses to any individual. It is the intent of this Section to provide indemnification to Members and Manager to the fullest extent now or hereafter permitted by the law consistent with the terms and conditions of this Section. Indemnification shall be provided in accordance with this Section irrespective of the nature of the legal or equitable theory upon which a claim is made including without limitation negligence, breach of duty, mismanagement, waste, breach of contract, breach of warranty, strict liability, violation of federal or state securities law, violation of the Employee Retirement Income Security Act of 1974, as amended, or violation of any other state or federal law.

(h) For purposes of this Section:

(i) The term "expenses" includes all direct and indirect costs (including without limitation counsel fees, retainers, court costs, printing and binding costs, telephone charges, postage, delivery service fees and all other disbursements or out-of-pocket expenses) actually incurred in connection with the investigation, defense, settlement or appeal of a proceeding or establishing or enforcing a right to indemnification under this Section, applicable law or otherwise.

(ii) The term "liability" means the obligation to pay a judgment, settlement, penalty, fine, excise tax (including an excise tax assessed with respect to an employee benefit plan), or reasonable expenses incurred with respect to a proceeding.

(iii) The term "party" includes an individual who was, is or is threatened to be made a named defendant or respondent in a proceeding.

(iv) The term "proceeding" means any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative and whether formal or informal.

(i) The Company may purchase and maintain insurance for its benefit, the benefit of any individual who is entitled to indemnification under this Section, or both, against any liability asserted against or incurred by such individual in any capacity or arising out of such individual's service with the Company, whether or not the Company would have the power to indemnify such individual against such liability.

# ARTICLE IX

## Miscellaneous

**Section 9.1. Complete Agreement.**  This Agreement and the Articles constitute the complete and exclusive statement of agreement among the Members with respect to the subject matter hereof.  This Agreement and the Articles replace and supersede all prior agreements by and among the Members or any of them.  This Agreement and the Articles supersede all prior written and oral statements and no representation, statement, or condition or warranty not contained in this Agreement or the Articles will be binding on the Members or have any force or effect whatsoever.

**Section 9.2. Governing Law.**  This Agreement and the rights of the parties hereunder will be governed by, interpreted, and enforced in accordance with the laws of the State of South Dakota.

**Section 9.3. Binding Effect,**  Subject to the provisions of this Agreement relating to transferability, this Agreement will be binding upon and inure to the benefit of the Members, and their respective distributees, successors and assigns.

**Section 9.4. Terms.**  Common nouns and pronouns will be deemed to refer to the masculine, feminine, neuter, singular and plural, as the identity of the person or persons, firm or corporation may in the context require.  Any reference to the Code or other statutes or laws will include all amendments, modifications, or replacements of the specific Sections and provisions concerned.

**Section 9.5. Headings.**  All headings herein are inserted only for convenience and ease of reference and are not to be considered in the construction or interpretation of any provision of this Agreement.

**Section 9.6. Severability.**  If any provision of this Agreement is held to be illegal, invalid, or unenforceable under the present or future laws effective during the term of this Agreement, such provision will be fully severable; this Agreement will be construed and enforced as if such illegal, invalid, or unenforceable provisions of this Agreement will remain in full force and effect and will not be affected by the illegal, invalid, or unenforceable provision or by its severance from this Agreement.  Furthermore, in lieu of such illegal, invalid, or unenforceable provision, there will be added automatically as a part of this Agreement a provision as similar in terms to such illegal, invalid, or unenforceable provision as may be possible and be legal, valid, and enforceable.

**Section 9.7. Multiple Counterparts.**  This Agreement may be executed in several counterparts, each of which will be deemed an original but all of which will constitute one and the same instrument.  However, in making proof hereof it will be necessary to produce only one copy hereof signed by the party to be charged.

**Section 9.8.  Additional Documents and Acts.**  Each Member agrees to execute and deliver such additional documents and instruments and to perform such additional acts as may be necessary or appropriate to effectuate, carry out and perform all of the terms, provisions, and conditions of this Agreement and the transactions contemplated hereby.

**Section 9.9.  No Third Party Beneficiary.**  This Agreement is made solely and specifically among and for the benefit of the parties hereto, and their respective successors and assigns subject to the express provisions hereof relating to successors and assigns, and no other person will have any rights, interest, or claims hereunder or be entitled to any benefits under or on account of this Agreement as a third party beneficiary or otherwise.

**Section 9.10.  References of This Agreement.**  Numbered or lettered Articles, Sections and Subsections herein contained refer to Articles, Sections and Subsections of this Agreement unless otherwise expressly stated.

**Section 9.11.  Notices.**  Any notice to be given or to be served upon the Company or any party hereto in connection with this Agreement must be in writing and will be deemed to have been given and received when delivered to the address specified by the party to receive the notice.  Such notices will be given to a Member at the address specified in Exhibit "B" hereto.  Any Member or the Company may, at any time by giving five (5) days prior written notice to the other Members and the Company, designate any other address in substitution of the foregoing address to which such notice will be given.

**Section 9.12.  Amendments.**  All amendments to this Agreement will be in writing and signed by all the Members.  Amendments to the Articles, when duly adopted, may be executed by the Manager.

**Section 9.13.  Title to Company Property.**  Legal title to all property of the Company will be held and conveyed in the name of the Company.

**Section 9.14.  Reliance on Authority of Person Signing Agreement.**  In the event that a Member is not a natural person, neither the Company nor any Member will (a) be required to determine the authority of the individual signing this Agreement to make any commitment or undertaking on behalf of such entity or to determine any fact or circumstance bearing upon the existence of the authority of such individual, or (b) be required to see to the application or distribution of proceeds paid or credited to individuals signing this Agreement on behalf of such entity.

**Section 9.15.  Waivers.**  The failure of any party to seek redress for violation of or to insist upon the strict performance of any covenant or condition of this Agreement shall not prevent a subsequent act, which would have originally constituted a violation, from having the effect of an original violation.

**Section 9.16. Rights and Remedies Cumulative.**  The rights and remedies provided by this Agreement are cumulative and the use of any one right or remedy by any party shall not preclude or waive the right to use any or all other remedies.  Said rights and remedies are given in addition to any other rights the parties may have by law, statute, ordinance or otherwise.

**Section 9.17. Creditors.**  None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditors of the Company or any Member.  Rights of any judgment creditors of Members shall be governed solely by the Act and shall be subject to all terms and provisions of this Agreement.

**Section 9.18. Rule Against Perpetuities.**  The parties hereto intend that the Rule against Perpetuities (and any similar rule of law) not be applicable to any provisions of this Agreement.  However, notwithstanding anything to the contrary in this Agreement, if any provision in this Agreement would be invalid or unenforceable because of the Rule against Perpetuities or any similar rule of law but for this §9.18, the parties hereto hereby agree that any future interest which is created pursuant to said provision shall cease if it is not vested within twenty-one (21) years after the death of the survivor of the group composed of the undersigned (all who are currently Members of the Company) and their issue who are living on the date of this Agreement and their issue, if any, who are living on the effective date of this Agreement.

**Section 9.19. Tax Provisions.**  It is the specific intention of the Organizers and Members that the Company be treated as a partnership for Federal and State tax purposes.  Wherever in the Articles or in this Agreement an intention has been expressed to qualify for any particular tax treatment under any Section or Sections of the Code and the rulings and regulations promulgated thereunder, as from time to time amended, or under any provision of State tax laws, the terms and provisions of the Articles and this Agreement shall be administered and construed to effect the qualification intended and any provisions thereof inconsistent with said intent, are hereby declared void and of no effect.  In furtherance of these intentions, the Manager is hereby granted the limited power to amend the terms and provisions of the Articles and this Agreement to effect such qualification and any such amendment shall apply retroactively to the date of filing of the Articles or execution of this Agreement as the case might be.

**IN WITNESS WHEREOF**, KLW MANAGEMENT, LLC by and through its Members, KRYSTAL L. WHALEY and MAXWELL D. WOOLUMS, have executed this Agreement to be effected as of the date the Articles of Organization of the Company are accepted for filing by the South Dakota Secretary of State.

_____          _____
KRYSTAL L. WHALEY, Member                          MAXWELL D. WOOLUMS, Member
and Manager

26

## Exhibit "A

### TO

### OPERATING AGREEMENT

### FOR

### KLW MANAGEMENT, LLC

**Articles of Organization for KLW MANAGEMENT, LLC  as filed with the South Dakota Secretary of State.**

# EXHIBIT "A"

DL160505

B0090-6342 02/17/2019 6:55PM Rec'd by SD SOS

# ARTICLES OF ORGANIZATION

## DOMESTIC LIMITED LIABILITY COMPANY
### SDCL 47-34A-203, 212

Secretary of State
500 E. Capitol Ave
Pierre, SD 57501-5070
(605) 773-4845

**Please Type or Print Clearly in Ink**
**Please submit one Original**
**Make payable to the SECRETARY OF STATE**

| Filing Fee: $150 |
| --- |
| Total Fee: $150 |

## Article I

The name of the Company:      **KLW MANAGEMENT, LLC**

## Article II

The address of the initial designated office in or out of the State of South Dakota where the company conducts its business:

Actual Street Address

**4515 EAST PARKWAY**
**GATLINBURG, TN  37738**

Mailing Address

**P. O. BOX 270**
**GATLINBURG, TN  37738**

## Article III
### SDCL 59-11-6

The South Dakota Registered Agent's Name:

South Dakota law permits the registered agent to be either (a) a noncommercial registered agent or (b) a commercial registered agent.

(a) The South Dakota Noncommercial Registered Agent's name

Name   **MAY, ADAM, GERDES & THOMPSON LLP**

Actual Street Address in this State

**503 S PIERRE STREET**
**PIERRE, SD  57501-4522**

Mailing Address in this State

**503 S PIERRE STREET**
**PIERRE, SD  57501-4522**

## Article IV

The name and address of each organizer

| Name | Address |
| --- | --- |
| **PHILIP NEMETH** | **4515 EAST PARKWAY, GATLINBURG, TN 37738** |

## Article V

The duration of the company if other than perpetual is: **Perpetual**

If the document is not to be effective upon filing by the Secretary of State, the delayed effective date is: _____



B0090-6343  02/17/2019  6:55PM Rec'd by SD SOS

## Article VI

☑ Member-Managed          ☐ Manager-Managed

## Article VII

Whether one or more of the members of the company are to be liable for its debts and obligations as set forth under SDCL 47-34A-303(c).

☐ Yes          ☑ No

## Article VIII

Beneficial Owners (optional): A beneficial owner is a person who has or in some manner controls an equity security. Please consult an attorney for legal advice if you have any questions concerning this entry. Any question under this heading is considered a request for legal advice and the secretary of state's office is, by statute, not permitted, to provide legal advice.

## Signature/Authorization

The Articles of Organization must be executed by the organizers.

No person may execute this report knowing it is false in any material respect.  Any violation may be subject to a criminal penalty (SDCL 22-39-36).

| PHILIP NEMETH | *PHILIP NEMETH* | ORGANIZER | 02/17/2019 |
|---|---|---|---|
| PRINTED NAME | SIGNATURE | TITLE | DATED |

# State of South Dakota

## Office of the Secretary of State

## Certificate of Organization

### Domestic Limited Liability Company

**I, Steve Barnett,** Secretary of State of the State of South Dakota, hereby certify that the Articles of Organization for

### KLW MANAGEMENT, LLC

BUSINESS ID# DL160505

with an effective date of: February 17, 2019, duly signed and verified, pursuant to the provisions of the South Dakota Limited Liability Company Act, has been received in this office and is found to conform to law.

**ACCORDINGLY,** and by virtue of the authority vested in me by law, I hereby issue this Certificate of Organization and attach hereto a duplicate of the Articles of Organization.



**IN TESTIMONY WHEREOF,** I have hereunto set my hand and caused to be affixed the Great Seal of the State of South Dakota, in Pierre, the Capital City, this day, February 17, 2019.

*Steve Barnett*

**Steve Barnett**
**Secretary of State**

02/17/2019 6:55 PM

# ASSIGNMENT OF ORGANIZER'S
# <u>RIGHTS IN LIMITED LIABILITY COMPANY</u>

**KNOW ALL MEN BY THESE PRESENTS:**

**WHEREAS**, PHILIP NEMETH, Attorney at Law (**"Assignor"**) acted as the Organizer on the Articles of Organization of KLW MANAGMENT, LLC, a domestic South Dakota Limited Liability Company (the **"Company"**) as filed with the Secretary of State of South Dakota on behalf of Krystal L. Whaley and Maxwell D. Woolums, (**"Assignees"**), who are the Members of the Company; and

**WHEREAS**, Assignor desires to transfer and assign any and all rights, interests and liabilities he may have acquired or incurred as a result of his acting as the Organizer of the Company to Assignee; and

**WHEREAS**, said Assignees have accepted this transfer and assignment by their execution of the Operating Agreement for the Company acknowledging their ownership of all rights in the Company.

**NOW, THEREFORE**, for value received, Assignor does hereby transfer, assign and convey to Assignees any and all rights, interests and liabilities Assignor may have acquired or incurred as the Organizer of the Company.

**EXECUTED AND DELIVERED** by the undersigned effective as of the 27th day of September, 2017.

**ASSIGNOR:**

_Philip Nemeth, Attorney at Law_

## Exhibit "B"

## TO

## OPERATING AGREEMENT

## FOR

## KLW MANAGEMENT, LLC

| Member | Initial Capital Contribution | Percentage Interest |
|---|---|---|
| KRYSTAL L. WHALEY | $500 | 50% |
| MAXWELL D. WOOLUMS | $500 | 50% |

# EXHIBIT "B"

# GENERAL ASSIGNMENT

**KNOW ALL MEN BY THESE PRESENTS:**

**FOR VALUE RECEIVED,** and as a part of Assignors' capital contribution as Members of KLW MANAGEMENT, LLC, the undersigned Assignors hereby transfer, assign and convey unto KLW MANAGEMENT. LLC, as Assignee, all of Assignors' right, title, interest and to the personal property as listed and described on Exhibit "A" attached hereto, to have and to hold unto said Assignee forever.

**IN WITNESS WHEREOF,** Assignor has executed this Assignment effective as of February 17, 2019.

ASSIGNORS:

_____
Krystal L. Whaley

_____
Maxwell D. Woolums

EXHIBIT "A" TO ASSIGNMENT

TO KLW MANAGEMENT, LLC

## ASSIGNMENT OF MEMBERS' INTERESTS
## IN LIMITED LIABILITY COMPANY

**KNOW ALL MEN BY THESE PRESENTS:**

**WHEREAS**, KREYSTAL L. WHALEY and MAXWELL D. WOOLUMS (herein the **"Assignors"**) are a Members of KLW MANAGEMENT, LLC (herein the **"Company"**), a South Dakota Limited Liability Company organized on February 17, 2019, and operating under that certain Operating Agreement of even date (herein the **"Agreement"**); and

**WHEREAS**, Assignors, are currently the owners and holders of ONE HUNDRED PERCENT (100%) of the interests in the Company pursuant to the Agreement; and

**WHEREAS**, Assignors desire to transfer and assign all of their interests as Members in the Company to KRYSTAL L. WHALEY and MAXWELL D. WOOLUMS, as Co-Trustees of The K AND M Family Trust Family Trust (herein the **Assignees"**), pursuant to the provisions the Agreement; and

**WHEREAS**, said Assignees have accepted the transfer and the same has been approved by all Members of the Company.

**NOW, THEREFORE**, for value received, Assignors do hereby transfer, assign and convey to Assignees all of Assignors right, title and interest as Members of the Company effective as of the date set forth below.

This document shall be filed with the records of the Company and shall constitute an amendment to the Agreement with regard to the Members of the Company and their respective interests in the Company.

**EXECUTED AND DELIVERED** by the undersigned effective as of the 25th day of February, 2019.

**ASSIGNORS:**

Krystal L. Whaley

Maxwell D. Woolums

**ASSIGNEES:**

Krystal L. Whaley, as Co-Trustee of The K and M Family Trust

Maxwell D. Woolums, as Co-Trustee of The K and M Family Trust